Cyril HUBERT, doing business as Curley's Log Cabin Co., Plaintiff-Appellant,

v.

George S. MAY, Dale S. May, Dorothy May Canty, and Jean May Rech, doing business as George S. May Company, Defendants-Appellees.

No. 13235.

United States Court of Appeals Seventh Circuit.

July 24, 1961.

**240**

Edward J. Kelly, Jr., John T. Coburn, Chicago, Ill., for plaintiff-appellant.

Thomas D. Allen, Frederick W. Temple, Chicago, Ill., for defendants-appellees.

Before HASTINGS, Chief Judge, and SCHNACKENBERG and KNOCH, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiff Cyril Hubert, doing business as Curley's Log Cabin Co., brought this action to recover damages for breach of contract and fraud. The District Court directed a verdict, in favor of the defendants, at the close of the plaintiff's case, and this appeal followed.

Plaintiff contends that he presented evidence, including inferences reasonably drawn therefrom, from which (considered in the light most favorable to plaintiff) fair-minded men might honestly draw different conclusions, and that there were questions of fact which should have gone to the jury.

Mr. Hubert makes log cabins for private and commercial use. On May 25, 1954, he employed the defendants (hereinafter sometimes called "May") to furnish business engineering services, beginning June 1, 1954, at $20 per hour, on an estimate of 150 hours for the completed job. By July 20, 1954, a total of 560 hours had been expended. Mr. Hubert had paid May $7,100. He then executed promissory notes for $4,100. All these transactions occurred in the State of Michigan where Mr. Hubert carries on his business.

Mr. Hubert's amended complaint, in four counts, charges: (1) that May held itself out as possessing special skill and experience in the field of business engineering, but breached its contract with Mr. Hubert in negligently and fraudulently failing to perform the contract services with the special skill which it promised; (2) that May had no intention of furnishing the contract services; (3) that May's pretended performance of services constituted a fraudulent scheme designed merely to extract fees from Mr. Hubert; and (4) that May fraudulently breached its obligations under the fiduciary relationship which existed between May and Mr. Hubert.

The evidence adduced by Mr. Hubert's witnesses, in direct and cross-examination, is briefly summarized as follows:

Mr. Hubert discussed his business problems with a May representative in

the spring of 1954. Later another May employee spent five or six days surveying Mr. Hubert's operations. Mr. Hubert paid May $100 for that service. The survey report concluded that:

> Curley has the equipment and the know-how to make and erect lots of cabins and year around homes. All he needs is the Sales and financing for his homes and cabins.

On May 25, 1954, Mr. Hubert, in writing, authorized May to assign engineering staff for installation development work. The authorization refers to "Sales Engineers Supervisor—Estimated hours 150." At $20 per hour, that would authorize expenditure of $3,000. May's "job closing report" form, introduced as one of plaintiff's exhibits, shows the following figures: "authorized $3,000" "potential $5,400."

May sent two men to Curley's Log Cabin Co., Mr. Hubert's plant. One, the supervisor, was Wilhelm Olsen. He was experienced in finance and promotion, had been cashier and head of an accounting department, and had served as an advertising account executive. The other was Sol Sevin. He had been in the lumber business since 1926, in retail management, operations, accounting, building and financing. Mr. Sevin testified that immediately prior to undertaking Mr. Hubert's project, he had worked for May in Kansas City, Missouri, where in five months he had developed a sales program from $2,200,000 to $4,000,000, with a pre-determined profit of $600,000 after federal income tax.

After a job conference with Mr. Sevin and Mr. Olsen, Mr. Hubert signed a document which by its terms embodied the entire agreement of the parties, and which included the following provisions:

> "1. Throughout the period of engagement, the George S. May Company staff will, through the medium of discussions, recommendations, and progress reports, keep the client informed as to its progress.

> "2. In order that there may be a continual meeting of the minds between the client and the George S. May Company and, particularly, in order that the continuation of the services of the George S. May Company is at all times within client's control, acceptance or rejection of all, or any part, of matters covered in discussions or recommendations referred to in Paragraph 1, shall be by client's signature to Progress Reports of the George S. May Company under 'Examined, Accepted and Approved,' specifically excluding by designation any statement not approved.

> "3. Recognizing the achievements realized from business engineering work depend upon many factors, including human aptitudes and the cooperation of your staff, which factors are not within the control of the George S. May Company, it is understood and agreed that no express or implied warranty of any general or specific results shall apply to the work done under this agreement.

> \*   \*   \*   \*   \*   \*

> "6. For the guidance of installation development and job progress, the Engineering Staff will design an action program around each major objective sought. A major objective is attained through a precisely formulated phase or unit of business engineering service termed a Project. Each engagement requires the adaptation and installation of one or more Projects, depending upon the number of major objectives. The Engineering Staff time required on each assignment depends upon the content of each Project, and the number. Authorized Projects may run concurrently or consecutively, depending upon mutual agreement.

> "7. Business engineering must develop from facts because all installation is custom adapted around each authorized Project. Consequently, initial steps of the engage-

ment require sufficient time as approved for development in order to demonstrate results.

\* \* \* \* \* \*

"11. The client may terminate the services of the George S. May Company Business Engineering Staff at any time, by declaration of such intent made to the Supervising Engineer when he is on the client's premises, at the same time presenting the Supervising Engineer with a check for all fees due up to the time of termination. All matters pertaining to the engagement should be taken up with the Supervising Engineer, upon whom is placed complete responsibility for job progress."

After an audit of Mr. Hubert's books, which took several days, Mr. Olsen and Mr. Sevin prepared a financial statement and other documents for presentation to lending institutions to secure financing. Certain figures, such as those in the depreciation schedule which Mr. Hubert had filed with his 1953 income tax return, were considered as fixed because they could not be changed without writing to the Internal Revenue Department, and were adopted for the financial statement.

In Mr. Hubert's view, Mr. Olsen and Mr. Sevin wasted time (at a cost to Mr. Hubert of $20 per hour) in unnecessary copy and double-check of figures taken from Mr. Hubert's own records. One of plaintiff's exhibits was Mr. Olsen's "Supervisor's Daily Report" which had been sent to May for June 11, 1954, in which Mr. Olsen stated:

"We are nursing this job along until we get financial situation clarified which we hope to do next Tuesday."

On cross-examination, Mr. Hubert testified that his check register for May 22, 1954, (about a week before Mr. Olsen and Mr. Sevin came) showed a bank balance of $125.79.

In consultation with Mr. Hubert, Mr. Sevin prepared projected budget and sales programs for 1954 showing predetermined sales of $263,000. Mr. Sevin and Mr. Olsen in six or seven weeks did have $47,000 in contracts approved, which compared favorably with Mr. Hubert's own prior business for a whole year.

Weekly invoice reports were presented to Mr. Hubert for approval. Mr. Hubert read and signed all of them without striking out any items. He could have rejected specific items as provided for in paragraph 2 of his contract with May, or, in the alternative, he could have terminated the services as provided for in paragraph 11 of the contract. Mr. Hubert testified that he did orally question some items, but signed the reports without change only because of oral assurances from Mr. Sevin or Mr. Olsen.

Mr. Hubert testified further that the items of work listed in the reports had been performed, although he characterizes most of the work done as unnecessary, repetitious and ineffectual. Numerous banking institutions were visited, frequently in company with Mr. Hubert, in an effort to secure financing.

Two checks given by Mr. Hubert for the services listed in the weekly reports of July 2nd and July 9th (in the amount of $1,300 each) were returned by Mr. Hubert's bank marked "not sufficient funds."

Mr. Hubert testified that he discharged May when he became convinced from observing Mr. Olsen and Mr. Sevin, and from a telephone conversation which he overheard,\* that May was not perform-

---

\* Mr. Hubert described the conversation as follows:

"A. The phone rang and I answered it. There wasn't any noise into the plant at all. I heard this talk back and forth over the phone.

"Q. Did you recognize any of the voices? A. Yes, I did, Mr. Olsen.

"Q. Did you hear the identity or location of the other party? A. Yes. They said it was a call from Chicago. The operator mentioned that.

\* \* \* \* \*

"Q. What did Mr. Olsen say and what did the person on the other end say? A. The person on the other end asked about

ing its contract, had never intended to perform, and was merely pretending performance to secure fees without actually rendering any service.

Mr. Hubert signed the invoice reports of July 16th and July 20th, but did not immediately pay for the services listed therein. He approved the report of July 20th, although, according to his testimony, he discharged May on that day. He also signed notes for the $4,100 remaining due and unpaid for the approved invoice reports. He testified that he might have executed the notes after deciding to discharge May.

Mr. Hubert testified that he was left in a very poor business position after the May people were discharged and that he was obliged to close down. Later he explained that he shut down because:

"A. * * * So far as full production or shipment, it is awfully hard to ship in two feet of snow, out in the foundation.

"Q. That snow condition existed before the May people came there and it still existed today, doesn't it?

"A. Not ordinarily. We have had open winters, too, * * *"

Although Mr. Hubert attributed none of the sales or financing, he later secured, to the efforts of Mr. Sevin or Mr. Olsen, his records for November, 1954, through December, 1955, did show gross sales in excess of $62,000. With respect to a loan from the Presque Isle Bank in Rogers City, Mr. Hubert testified that it was through the Small Business Administration in Detroit that he learned about that, and that Mr. Sevin had merely gone along with Mr. Hubert when he visited the Rogers City bank to arrange the loan.

Plaintiff's evidence did show that Mr. Sevin and Mr. Olsen devoted a great deal of time and effort to promotion of sales and to securing financing for sales contracts and for working capital. The contract between Mr. Hubert and May expressly negatives any warranty of results. Plaintiff's own evidence shows that May provided the business engineering service for which plaintiff contracted. Under the terms of the contract, May's failure to keep within its original advance estimate did not constitute a breach. In any event, the contract allowed Mr. Hubert to terminate May's services at any time. Mr. Hubert did approve the weekly reports, including the last reports for which he executed notes. At that time he knew all of the facts on which he now bases his allegations of breach of contract and fraud.

■ Thus an account was rendered by May to Mr. Hubert who received and accepted it. The evidence supported the District Court's conclusion that there had been an account stated. Pelavin v. Fenton, Davis & Boyle, 1931, 255 Mich. 680, 239 N.W. 268; May v. Chas. O. Larson Co., 1940, 304 Ill.App. 137, 26 N.E.2d 139.

■ There is a lack of proof with reference to the several elements which plaintiff must prove to establish fraud. Plaintiff asserts as a conclusion that May never intended to furnish engineering service. Plaintiff's own evidence shows that, regardless of intent, May's employees did furnish such service. Non-performance, however, in itself is not evidence of fraud. Howard v. Reaume, 1944, 310 Mich. 119, 16 N.W.2d 686. Fraud must be proved clearly and convincingly. Columbus Pipe & Equipment Co. v. Sefansky, 1958, 352 Mich. 539, 90 N.W.2d 492; Vargo v. Ihlenfeldt, 1960, 359 Mich. 265, 102 N.W.2d 550. Plaintiff failed to sustain this burden of proof. As the United States Supreme

---

the two or three checks, what was the matter with them that they bounced and said that if they had all the money up there, to get out of there.

* * * * *

"A. Olsen said that they had—that application in to Rogers City was made and I had some money coming in and they would see if they could get some of it.

* * * * *

"A. That was about the end of the call."

Court stated in Gunning v. Cooley, 1930, 281 U.S. 90, 50 S.Ct. 231, 233, 74 L.Ed. 720:

"A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" [citing cases]

All other arguments advanced by plaintiff have been considered. They do not alter our conclusion that the judgment of the District Court must be affirmed.

