Arthur J. HOHMANN, Plaintiff-Appellant,
and
Harold S. Burman et al., Plaintiffs-Appellants,

v.

PACKARD INSTRUMENT COMPANY, INC., et al., Defendants-Appellees.

No. 71–1462.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 1972.

Decided Jan. 17, 1973.

tion, Inc. v. Davis, 5 Cir. 1969, 406 F.2d 1158.

A. Bradley Eben, Arnold I. Shure, John Enright, Chicago, Ill., for plaintiffs-appellants.

George S. Hoban, Perry L. Fuller, George W. Hamman, Roger W. Barrett, Chicago, Ill., for defendants-appellees.

Before HASTINGS, Senior Circuit Judge, CUMMINGS, Circuit Judge, and GORDON, District Judge.*

HASTINGS, Senior Circuit Judge.

This long pending litigation first began in 1963 when two actions were filed

* District Judge Myron L. Gordon of the Eastern District of Wisconsin is sitting by designation.

in the federal district court. The cases were subsequently consolidated for trial and finally proceeded to trial by jury in March 1971. At the conclusion of plaintiffs' evidence, the trial court granted the motions of all defendants for a directed verdict and entered judgment against plaintiffs and for defendants. Plaintiffs appealed. We affirm.

On May 29, 1963, in No. 63–C–953, Arthur J. Hohmann filed his action alleging a violation by defendants of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Rule 10(b)–5(2) promulgated thereunder, which proscribes the use of a manipulative device or contrivance prohibited by the rules and regulations of the Securities and Exchange Commission. Hohmann is the sole plaintiff and is an investment counselor residing in London, England, and at the time was engaged in the advertising business. This shall be referred to as the *Hohmann* case.

On June 4, 1963, in No. 63–C–981, Harold S. Burman, Robert L. Burman and Marshall R. Burman, d/b/a Burman Investments, a partnership, (together with Charles Ashbrook, later dismissed as a plaintiff) filed their action (later amended), alleging a violation by defendants of § 11 of the Securities Act of 1933, 15 U.S.C.A. § 77k. They claimed that a prospectus filed with a registration statement of Packard Instrument Company, Inc., for a stock offering in 1963, was untrue and misleading because of the omission of material facts required to be stated therein. The Burmans are three brothers, one of whom filed the action as an attorney. This shall be referred to as the *Burman* case.

Each of these actions was brought by plaintiffs on their own behalf and as a class action on behalf of persons similarly situated. After extensive discovery and during preparation for trial, the trial court, on June 30, 1967, on motion of defendants, entered an interlocutory order striking the class actions of the two complaints. Hohmann v. Packard Instrument, N.D.Ill., 43 F.R.D. 192 (1967). On appeal, we held the actions were properly brought as class actions and reversed. Hohmann v. Packard Instrument Co., 7 Cir., 399 F.2d 711 (1968).

Remaining as named defendants at the subsequent trial and common to both suits were (1) Packard Instrument Company, Inc. (Packard Instrument), an Illinois corporation located in Brookfield, Illinois, with its principal manufacturing business in Downers Grove, Illinois; (2) Lyle E. Packard, its president, chairman of the board, a director and majority stockholder; (3) A. G. Becker & Co., Incorporated (Becker), an Illinois corporation, of Chicago, which underwrites and sells securities; and (4) Joseph J. Levin, chairman of the executive committee of Becker and also a director of Packard Instrument.

In this consolidated class action the class was defined to be all persons who purchased shares of stock in Packard Instrument during the period from February 19, 1963, through March 26, 1964, inclusive. After a history of intermittent vigorous prosecution and bitter defense from 1963 to March 1, 1971, the case was called for trial by jury on the latter date. The trial proceeded until plaintiffs rested their case on March 11, 1971. On that date the trial court granted the motions of all defendants for a directed verdict and entered judgment against plaintiffs and for all defendants.

The technical nature of the devices manufactured by Packard Instrument causes us to accept its undisputed description of the same on brief and as substantially represented in its prospectus of February 19, 1963, as follows:

"The company's products are instruments for the detection and measurement of radioactive isotopes used primarily in tracer studies in scientific research. The principal purchasers of the equipment are research laboratories of universities and colleges, governmental research centers, privately supported research facilities and research hospitals, as well as the United

States Government and Veterans Administration Hospitals.

"The principal product of the company is the Tri-Carb Liquid Scintillation Spectrometer. The instrument is used for detection and measurement of radioactive isotopes. A radioactive sample to be identified and counted is placed in a solution of liquid scintillator and placed between the instrument's two photomultiplier tubes. The solution produces an extremely small burst of light or scintillation for each radioactive emanation or particle that occurs in the sample. The scintillations are converted to bursts of electrons within the photomultipliers and greatly amplified to produce electrical impulses. The impulses are further amplified electronically and measured and counted by means of high-speed type circuitry.

"The particular value of the Tri-Carb Spectrometer in research lies in the ability to measure automatically and accurately large numbers of radioactive samples. Radioactive isotopes are used in investigations and research into cancer, cardio-vascular diseases, the etiology of mental diseases, in studies of arthritis, rheumatic fever and nutritional studies of many types. Pharmaceutical firms use the instruments to determine the effects of newly developed drugs on the human body. Industrial research laboratories in the chemical, petroleum, tobacco and food industries also use Tri-Carb Spectrometers.

"The company also produces other instruments for the measurement of radioactivity including an instrument for counting radioactivity in laboratory animals and humans. New products which had been introduced or were about to be introduced in 1963 included gas chromatography equipment and large volume scintillation detectors."

From its incorporation in 1957 the sales of Packard Instrument regularly increased. In April 1961, the company made its first public offering of 100,000 common shares which were traded in the over-the-counter market. The prospectus issued in that offering, in describing the shares, said: "These are speculative securities." In February 1963, a second public offering, the subject of the instant litigation, was made. The company offered 50,000 common shares and a like amount was offered by Mr. Packard. This proposed sale of 100,000 common shares to the public, at $21.50 per share, was through an underwriting group headed by Becker. In connection with this public offering a registration statement, including a prospectus, was filed with the Securities and Exchange Commission, effective February 19, 1963. The proceeds of the shares offered by the company were to be used for a 24,000 square foot addition to its Downers Grove plant, and the balance was to be added to working capital to finance increased inventories and accounts receivable. Pursuant to this public offering, Hohmann purchased 500 shares of stock and Burman Investments purchased 175 shares.[1] Following this public offering Mr. Packard personally still owned 439,200 common shares, representing about 66 per cent of the shares outstanding. No part of the proceeds of the sale of Mr. Packard's stock was to be used by the company. He was the dominant person in the control and operation of the company.

The record shows that on June 30, 1967, AMBAC Industries, Incorporated, acquired all assets of Packard Instrument and assumed its liabilities in this litigation. It was made an additional party defendant in both cases, with a subsequent stipulation that AMBAC

---

1. The record shows that both Hohmann and Burman Investments purchased their respective shares at 21½. Hohmann subsequently sold 100 shares at 15½, 100 shares at 13½ and 300 shares at 11¾. Burman Investments subsequently sold its 175 shares at 11⅛.

would not be mentioned or referred to in the presence of the jury at the trial.

█ The essence of the consolidated actions is the claim against defendants for monetary damages for alleged violations of the anti-fraud provisions of the federal securities law. No equitable relief is sought. The thrust of the charges is the alleged omission of material facts required to be stated in the prospectus effective on February 19, 1963. In short, a recovery by plaintiffs in this civil action depends upon their proof of concealment by defendants of an existing fact or facts which would have caused or tended to cause plaintiffs, as reasonably prudent investors, to refrain from buying the stock publicly offered on February 19, 1963. A jury trial is appropriate in a damage action alleging such violations. Dasho v. Susquehanna Corp., 7 Cir., 461 F.2d 11, 24 (1972), cert. denied, 408 U.S. 925, 92 S. Ct. 2496, 33 L.Ed.2d 336.

█ The parties seem to agree that applicable federal securities law is clear and well settled and that this is, as they term it, a "factual" case. Since the case comes to us as an appeal from a judgment for defendants on a directed jury verdict at the close of plaintiffs' evidence in the consolidated trial, the critical question to be answered is whether the trial court erred in holding that plaintiffs had not discharged their required burden of proof to take the case to the jury at that point.

██ The standards for ruling on a motion for a directed jury verdict have long been well settled in this circuit. These standards find their base in the following statements by the Supreme Court in Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720 (1930) :

> "When, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a ver-

dict, if returned, would have to be set aside, the court may and should direct a verdict for the other party." [Citation omitted.] *Id.* at 93, 50 S.Ct. at 233.

> "A mere scintilla of evidence is not enough to require the submission of an issue to the jury. The decisions establish a more reasonable rule 'that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' " [Citations omitted.] *Id.* at 94, 50 S.Ct. at 233.

█ A long line of decisions following *Gunning* have further enunciated these standards. They are the same as those applicable in ruling on a motion for judgment notwithstanding the verdict. The trial court must determine whether the evidence justifies submission of the case to the jury. The motion should be denied where the evidence, along with inferences to be reasonably drawn therefrom, when viewed in the light most favorable to the party opposing such motion, is such that reasonable men in a fair and impartial exercise of their judgment may reach different conclusions. *See, e. g.,* Lambie v. Tibbits, 7 Cir., 267 F.2d 902, 903 (1959) ; Hubert v. May, 7 Cir., 292 F.2d 239, 244 (1961) ; Woods v. Geifman Food Stores, Inc., 7 Cir., 311 F.2d 711, 713 (1963) ; Farmers State Bank v. Dravo Corp., 7 Cir., 321 F.2d 38, 39 (1963) ; and cases cited in these foregoing authorities.

█ In resolving whether plaintiffs have discharged their required burden of proof, the primary question for the trial court, in this securities case as in any other civil action, is whether under the facts before it there is sufficient evidence of liability to warrant submission of this case to the jury. As is indicated by the portion of the Supreme Court's opinion in *Gunning* quoted above, the

trial court is not to follow a "scintilla" rule, but is to evaluate the evidence to determine whether it is of sufficient probative value that members of the jury might fairly and impartially differ as to the inferences to be reasonably drawn therefrom.

The prospectus in issue was dated and became effective on February 19, 1963. It contained an adequate description of the company and the use of the net proceeds of $20.00 per share from the sale of the 50,000 common shares offered by the company. It was shown that prior to April 1961 all of the company's outstanding stock had been owned by Mr. Packard. Bid prices on the stock were reported as ranging from a low of $16.-50 per share to a high of $29.00 in 1961; from $14.50 to $28.00 in 1962; and from $21.00 to $24.00 in 1963 through February 15; and on February 15, 1963, the reported bid and asked prices were $21.25 and $21.75, respectively. The consolidated statement of income for five years ending December 31, 1962, was set out.

In a statement concerning dividends the following representation was made: *"The Company has not paid cash dividends and does not plan to do so in the near future. In the opinion of the management, earnings at this stage of development can be most advantageously employed by reinvestment in the business."*

Included in a statement of the history and business of the company it was shown that: "The most important product, accounting in 1962 for approximately two-thirds of sales, is the Tri-Carb® Liquid Scintillation Spectrometer, which is available in models ranging in price from $5,500 to $12,500." The company's backlog of orders totaled approximately $361,000 as of December 31, 1961, and approximately $634,000 as of December 31, 1962. A section described a strong research and development program employing about 50 persons in that area with total expenditures for such purposes of about 10 per cent of sales in 1962. It was stated that the engineering department devoted its efforts to the development of new products and *improvement of existing models.* Some anticipated new products were described, as well as the company's competition in the nuclear instrument industry. The company was said to have been the first to produce liquid scintillation counting equipment, completing its first model in 1953 as a special project and starting regular production in 1954. The statement said the company believed it was the major producer of such equipment in this country and that it had about 265 employees.

We accept plaintiffs' summary on brief that the complaint in the *Hohmann* case and the amended complaint in the *Burman* case charged:

"3. The prospectus omitted to state the following material facts: (i) PIC was planning to and would stop production of these Spectrometers (Tri-Carb instruments) which had accounted for two-thirds of its 1962 sales and was attempting to redesign its entire line of these instruments, (ii) the stoppage of production incident to the model changeover would cause a reduction in total sales for the first four months of 1963, (iii) PIC would announce shortly after February 19, 1963 the redesigned line of Tri-Carb instruments, would exhibit them and solicit and accept orders for their sale and delivery, even though designs and development work were not complete and costs of production of the new instruments were unknown and not soundly predictable, (iv) the redesign of the Tri-Carb instruments and the termination of production as aforesaid and the attempt to manufacture and produce a redesigned line would entail substantial increased engineering, production, tooling and market expense, the effect of which would be to substantially reduce PIC's earnings as compared with those stated for previous periods in the prospectus."

The trial court heard plaintiffs' evidence. It also considered the probative value of certain evidence offered and rejected. It had before it the results of

years of effort devoted to discovery in its many aspects by the parties. Throughout the pendency of this action a voluminous record of motions, briefs and oral arguments during the pre-trial stages was urged upon and considered by a patient trial judge. During the seven days of trial, plaintiffs relied chiefly on the testimony of defendants and their employees, as well as their corporate records. When plaintiffs rested their case, the parties argued at length on defendants' motions for a directed verdict. At the conclusion, the trial court announced its ruling from the bench, granting defendants' motions and rendering its judgment accordingly.

In its ruling, the trial court stated:

"The Court has listened to the evidence as presented by the plaintiffs for nearly seven court days. The Court finds no evidence was presented or offered to establish a prima facie case in both cases, or to support or sustain the charges made in the complaints.

"The Court finds no evidence was offered or submitted or received by the Court that there was a material fact omission from the prospectus and that there was no evidence offered that if there was a fact, that it was in existence at the time of the effective date of the prospectus which was February 19, 1963.

"The Court finds that plaintiffs have failed to present any evidence that would in any way substantiate the establishment of a prima facie case in both complaints; therefore, the motion of defendant Lyle Packard and Packard Instruments, and the consolidated cases No. 63 C 953, 63 C 981 are granted. The motions of defendants Joseph Levin and A. G. Becker & Co. for a directed verdict on the aforementioned consolidated cases are granted."

Plaintiffs have detailed the evidence they claim required submission of the case to the jury and defendants have answered in kind. As previously stated, all parties consider this to be a "factual case" on appeal. We have treated it as such. We have carefully considered the evidence both received and rejected. We need not detail it here. It is sufficient to say that some things have become clear to us. The belabored prospectus of February 19, 1963, on its face, is not misleading. It certainly gave adequate information to advise any reasonably prudent investor that the stock being publicly offered for sale on that date was a growth stock without any early prospect of the payment of dividends. The issuing company was a relatively small corporation engaged in a highly competitive nuclear industry embracing a number of similar small companies. The company was engaged in an annual improvement program of its principal product such as would be expected of any successful business so engaged. The company proposed to devote the proceeds of the sale of its 50,000 shares to the expansion and development of its physical plant and to needed additional working capital. The company never deviated from its purpose to make its improved 1963 model at its proposed cost. It first planned to present two new models for 1963, one designed as the 4000 model to be the basic model selling at $12,500 and one designed as the 3000 model to sell at a lower price. The process of planning for production of these models was a continuing one, beginning in 1962. Unanticipated costs and problems of design and production were encountered and changes were required after February 19, 1963, with a resulting change in plans in April 1963. As a result thereof a decision was then reached to add certain features to the 3000 model and sell it as the basic model for $12,500. The 4000 model was to be a higher priced one with additional features. These modified models were subsequently produced. The changes in plans caused lower shipments for the first six months of 1963 and resulted in a loss for that period. New orders for that period were 10 per cent higher and shipments were 10 per cent lower. Vol-

ume shipments of the new models began in July 1963, about three months behind schedule. After the new models were shown in April 1963, new orders received in May and June broke all previous records and subsequent orders and shipments were expected to be higher than for any prior period.

As above set out, a temporary loss was incurred in the first half of 1963, and the over-the-counter market for the stock declined to 14¼ by May 28, 1963. Plaintiffs charge that such losses resulted from the alleged failure to disclose matters in the prospectus of February 19, 1963, herein set out, although most of them occurred in April and May thereafter. We are not satisfied that this charge is reasonably supported by any probative evidence in the record.

Considering plaintiffs' evidence in the light most favorable to them, we are unable to conclude that the district court erred in determining there was no evidence presented or offered upon which the jury could properly proceed to find a verdict for plaintiffs. The trial court properly discharged its duty in directing a verdict for defendants under these circumstances.

----

Assuming *arguendo* that the question of the exclusion of certain evidence offered by plaintiffs is properly before us, we shall also consider it. A press release by defendants on May 10, 1963, was offered by plaintiffs and excluded. On appeal, plaintiffs claim this was "a voluntary confession of plaintiffs' claims." We have examined the three paragraph statement and find that it has no relevance to the prospectus of February 19, 1963. It is simply an announcement that production of liquid scintillation counting systems was stopped in March (1963) in preparation for the introduction of "model changeover" shipments later that month. It stated that because of this model changeover "total shipments were off slightly from the first four months of last year" and that such slowdown sub-

stantially increased engineering, production, tooling and marketing expense associated with the redesign of the company's line and was expected to reduce earnings for the first half of 1963 substantially below the 40 cents per share shown in the first six months of 1962. It reported a "present order backlog" of "1.1 million dollars—some $475,000 above the 1962 year end figure." It further reported the market response to the new instruments "to have been very encouraging" and that significant sales gains were expected in the second half year period. We find nothing here which would have tended to prove any omission of material fact from the prospectus in issue.

Other documentary excluded evidence consisted of isolated statements from five advertising brochures issued by the company in mid-1963 and 1964 relating to the 1963 instruments as produced. Such phrases as "two entirely new series of instruments," "a new line," "new, bold and dramatic," "everything" new and "embodying more than a score of major design and operating improvements," found in the brochures, along with the excluded press release, were offered by plaintiffs "to prove by Packard's testimony that five months prior to February 19, 1963, PIC planned to replace its 1962 design with an entirely new series of instruments." Further, plaintiffs offered to prove certain corroborative post-prospectus cost testimony through one of the company's manufacturing officers. Again, we find nothing here which would tend to prove any omission of material fact from the prior prospectus under consideration. Indeed, we find the excluded evidence of no probative value whatever.

In our considered judgment, the rulings of the trial court on the excluded evidence were correct. Such excluded evidence was before the court in its final ruling and the court found that nothing was offered or submitted that "would in any way substantiate the establishment of a prima facie case in both complaints." We agree.

Plaintiffs' appeal from judgment in favor of defendants A. G. Becker & Co., Incorporated, and Joseph J. Levin does not require separate further consideration in light of the foregoing.

Plaintiffs have strenuously attempted to build a "factual case" on paper requiring submission to the jury. We believe they have failed to do so. The judgment of the district court is affirmed.

Affirmed.