MERIT INSURANCE COMPANY, an Illinois Corporation, Plaintiff-Appellant,

v.

Anthony COLAO et al.,
Defendants-Appellees.

No. 78–1460.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 7, 1978.

Decided Aug. 7, 1979.

Rehearing and Rehearing In Banc
Denied Nov. 6, 1979.

Charles J. O'Laughlin, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Thomas J. Weithers, Chicago, Ill., for defendants-appellees.

Before SWYGERT, LAY * and WOOD, Circuit Judges.

SWYGERT, Circuit Judge.

This diversity suit was started in 1975. The complaint, as amended, contained three counts. Count I alleged negligence; Count II—gross negligence; and Count III—fraud. At the pretrial stage, the district court dismissed the negligence counts for failure to state a claim and proceeded to try the fraud issue to a jury. For four months, November 1, 1977 to February 28, 1978, the plaintiff presented its case. On March 1, 1978 the trial judge granted motions for directed verdict in favor of all the defendants. From these adverse rulings, plaintiff appeals.

I

Merit is an Illinois casualty insurance company. It and its predecessor have been engaged in writing automobile liability insurance since 1968. The defendants are being sued individually and also as partners

---

* The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

in Joseph Froggatt & Co., an accounting firm located in New Jersey but also operating in Philadelphia and New York City.

Two other entities are involved: General Auto Placement, Inc. and Leatherby Insurance Company. General Auto was, before it became bankrupt, a New Jersey corporation selling automobile insurance policies to high risk drivers. It did not issue the policies; rather, it marketed policies that were written by licensed casualty insurance companies. Leonard Lebowitz, owner of eighty-five per cent of General Auto's stock, was president of the company and controlled its operations. Leatherby Insurance Company, a California-based casualty insurance company, started to underwrite policies for General Auto in May 1969. It was replaced by Merit in 1972.

The instant dispute centers on General Auto's financial arrangements with its underwriters. A distinctive feature of these arrangements was that General Auto was paid commissions by the underwriter on a "retrospective" basis. Rather than receiving a flat percentage of the policy premiums as its commission (the ordinary practice), General Auto earned its commission on a fluctuating scale; that is, after a review of its loss experience on the policies it had sold, General Auto received a profit (if any) gauged on the difference between the premiums paid by policyholders and amounts paid on claims. The underwriter received a fixed percentage of the premium as an "underwriting fee." Thus, General Auto functioned in large part as an insurance company without actually being one. It assumed most of the risks even though the underwriters were ultimately liable to the policyholders.

In general terms, General Auto's business was conducted as follows:

(1) General Auto agents received a commission of 15–20 percent of the premium collected by them on the policies sold.

(2) General Auto would report to the underwriter the policies it had sold and remit the premiums, less the agents' commissions.

(3) General Auto would give notice to the underwriting insurance company of any claims on the policies it had sold along with estimated settlement costs. The underwriter would place on its books the estimated settlement costs as "claim reserves," awaiting the actual amount of the claims paid.

(4) When the claims were settled, General Auto would issue drafts drawn on the underwriter to those entitled to share in the settlement.

(5) Every four months, General Auto would be paid by the underwriter a retrospective commission calculated on the basis of its earned premiums. General Auto was paid the total of earned premiums less:

    (a) the fixed underwriting fees,

    (b) the loss reserves, and

    (c) the amounts paid on closed claims.

By virtue of this formula the lower the loss reserves were the more General Auto was paid on each quarterly settlement between General Auto and its underwriter.

In order to evaluate the financial well being of General Auto at any particular time, it was necessary to look at the "loss ratio" of the total policies it had sold. This ratio could be calculated by comparing the combined amount of reserves and losses paid against the total amount of earned premiums. If General Auto had too high a loss ratio, the premiums would be insufficient to cover the losses on claims filed on the policies and the underwriter would be required to cover the deficiency. To protect itself against such a contingency, the underwriter required a guarantee from General Auto to cover any deficiency in premiums available to pay claims. Thus, so long as General Auto's loss ratio was low enough or was able to make up any deficiency, the underwriter had a guaranteed profit from its fixed fee.

General Auto was formed in 1969 and soon thereafter entered into a retrospective commission contract with Leatherby. The contract provided that General Auto was to be paid by Leatherby the amount of earned premiums generated by General Auto less

(1) 17.5 percent as a fixed underwriter fee, (2) the amount set aside as reserves on open claims, and (3) the amounts paid out on claims. The retrospective commission was to be calculated by Leatherby on a quarterly basis. The contract gave General Auto the right to suggest the amount of loss reserves, but Leatherby retained ultimate control over setting the amount of these reserves.

By August, 1970, Leatherby and General Auto were in dispute over the amount of loss reserves. Leatherby maintained that the reserves set by General Auto were forty percent less than what they should have been. General Auto thought thirty percent was more accurate. Leatherby insisted that the reserves should be increased by at least $85,000. An increase of that size would have created a severe cash flow difficulty for General Auto. President Lebowitz decided to find a replacement for Leatherby. Accordingly, he met in September 1970 with William A. F. Smith, head of the Philadelphia office of Joseph Froggatt & Co. They discussed the possibility of Froggatt providing General Auto with an audited financial statement which Lebowitz could use either to obtain public financing for purchase (or formation) of an insurance company or to induce another insurance company to supplant Leatherby.[1]

Smith said that a financial statement would aid in dealing with other insurance companies and indicated an interest in making such an audited statement. During the meeting Lebowitz told Smith about his policy of setting reserves as low as possible. Smith agreed that Froggatt would furnish the audited statement and in February 1971 telephoned Lebowitz, saying the audit for the year 1970 would start soon and that he would provide "the best looking statement he possibly could."

In March 1971 two Froggatt employees, Lotman and Cable, started the audit. During the course of their audit, they discover-

ed a variety of disturbing situations: (1) one of the expenses claimed by General Auto in its book of accounts was "Manager's Expense." An audit of this account revealed that more than half of the $64,045 listed consisted of personal, rather than business, expenses of Lebowitz. (2) General Auto did not report or transmit all premiums due Leatherby within the time required by the agency contract. Upon questioning by Cable, Lebowitz conceded that he deliberately engaged in late reporting to enhance the cash position of General Auto. (3) Cable and Lotman discovered that General Auto was keeping two different sets of policy records. One set, for General Auto's use, was complete. The other set, for Leatherby's use, did not include the endorsements which required the payment of additional premiums. After Lotman and Cable had completed their field audit, they turned over their work product to Smith.

In late June or early July 1971 Smith talked with Lebowitz several times about the drafts of the audited financial statement. The first draft submitted by Smith contained entries based on a loss ratio of approximately sixty-six percent. Lebowitz told Smith this was "totally unacceptable." Smith said he would review the matter. Several days later a new draft was produced showing a fifty-six percent loss ratio. Lebowitz said this corresponded to Leatherby's calculations which contained some "fat." A week later Smith submitted a third draft of a financial statement based on a fifty percent loss ratio. Lebowitz expressed satisfaction and said that with that kind of statement General Auto could either obtain an agency agreement with a different company or form its own company. (The trial judge excluded all testimony of conversations between Lebowitz and Smith concerning the draft statements.)

In September 1971 Lebowitz wrote a letter to Jerome Stern, president of Merit, saying that while General Auto was satisfied with its "present carrier," it had a

---

1. While Lebowitz was operating G.I.A., Inc., a company authorized to write automobile casualty insurance in New Jersey and Pennsylvania, he met William A. F. Smith. On Smith's ad-

vice, G.I.A. retained Froggatt to furnish auditing services. G.I.A. became insolvent in 1968 and went out of business. Thereafter, Lebowitz formed General Auto.

"capacity problem" and that General Auto was "looking for an additional company so that our expansion can continue." On April 4, 1972 Lebowitz sent a copy of the Froggatt audit statement for 1970 to Stern and an in-house unaudited financial statement for the first nine months of 1972. On June 22, 1972 Merit and General Auto entered into an agency agreement similar to the Leatherby agreement, and General Auto began selling Merit policies in July 1972. In October 1972 Merit entered into a contract with Leatherby and General Auto whereby Merit assumed Leatherby's outstanding policies sold by General Auto.

In November 1972 General Auto ceased issuing policies for Merit. It did continue to adjust claims it had issued for Merit and on the assumed Leatherby policies. By the end of July 1973 General Auto owed Merit $250,000 on promissory notes and $72,000 in premiums, and on August 8, 1973 Merit terminated its business relations with General Auto. Soon thereafter, General Auto went out of business. On the Leatherby policies assumed by Merit, Merit paid out between three and four million dollars compared to the nearly two million it had received from Leatherby. Merit also offered to make further proof of loss but was barred by an order of the trial judge.

## II

The judgment of the district court must be reversed primarily because it erred in directing a verdict for the defendants. Under the rule that requires the evidence to be viewed in the light most favorable to the party opposing a motion for directed verdict, the plaintiff presented sufficient evidence to establish a *prima facie* case of fraud despite the fact that much relevant evidence was not admitted. The standard for establishing a *prima facie* case under Illinois law is that "verdicts ought to be directed . . . only in those cases in which all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria &*

*Eastern R.R. Co.,* 37 Ill.2d 494, 229 N.E.2d 504 (1967).

Illinois law requires that civil fraud must be established by clear and convincing evidence, *Ray v. Winter,* 67 Ill.2d 296, 10 Ill.Dec. 225, 367 N.E.2d 678 (1977), and that the essential elements of fraud are: (1) the fraudulent representation must be a statement of a material fact, as opposed to mere opinions; (2) the representation must be untrue; (3) the one making the statement must know or believe that it is untrue; (4) the person to whom the statement is made must rely on it; (5) the statement must have been made for the purpose of inducing the other party to take some affirmative action; and (6) the reliance by the person to whom the statement is made must result in his injury. *Roth v. Roth,* 45 Ill.2d 19, 256 N.E.2d 838 (1970); *Roda v. Berko,* 401 Ill. 335, 339–40, 81 N.E.2d 912, 914 (1948). Except for the proof of the injury (damages), which was not permitted by the trial court, we are of the view that a *prima facie* case was made out by the plaintiff as to the above enumerated elements of fraud. Having already detailed the facts of this case, and since we remand for trial, no purpose would be served in further marshalling the evidence which compels that conclusion. We do note that reliance upon the report by plaintiff was primarily based on the testimony of Jerome Stern, president of Merit. Although his testimony was severely restricted (erroneously we think), that which was admitted made reliance a jury question.

Stern testified that it was General Auto's certified audit report which induced him to follow through on the business arrangement with General Auto. He said that he was particularly impressed with defendants' "clear opinion" showing that General Auto had a substantial net worth and high operating income. Stern further testified that he knew Froggatt to be a well-known accounting firm in the insurance field and believed at the time that it had given "an unqualified opinion that those statements fairly presented" General Auto's financial position. Thus, it became a jury question

as to whether Stern was justified in relying on the audit report which, in part at least, indicated General Auto's financial health in 1972.

Defendants argue that plaintiff failed to establish a *prima facie* case that they knowingly made material misrepresentations for the fraudulent purpose of inducing merit to act. Although much relevant and material evidence going to fraudulent intent was excluded erroneously by the trial judge, even that which was admitted was sufficient to present a jury question. Smith knew why the audit was made and he knew that a limited class of persons might rely on it. Moreover, Lebowitz testified about a meeting he had with Smith in September 1970:

> "I discussed at that time the problems that I was having with Leatherby Insurance Company in regard to the increases of loss reserves and I explained to him [Smith] the purpose of the audit was so that I would have a certified statement in order to attempt to obtain an underwriter for a public issue at the time and also that I was to approach other companies in an attempt to obtain another contract. He advised me at that time that he would look around and see what companies he could possibly suggest and he also felt that it was good to have a certified statement at that time."

### III

Contrary to the dissent, the majority of the panel is of the view that the trial court erred in dismissing Count One of the amended complaint alleging negligence in defendants' conduct in preparing and submitting the 1970 General Auto audit. Under Illinois law, privity between Merit and the defendants is not required. *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969). That case is the controlling authority in this area of the law of Illinois. One of the relevant criteria listed in *Rozny* is that potential liability for a negligent audit must be directed to a comparatively small group only one of whom would suffer a loss. The trial judge's ruling was based on this criterion. Defendants support the ruling by arguing that the extension of liability for negligence to unforeseen third parties "would impermissively extend the number of potential plaintiffs to an undeterminable class." App. Brief at 117. Plaintiff counter-argues that the class of insurance companies able to do business with General Auto, of which Merit was a member, was considerably more limited than the class of persons who might have bought the house in *Rozny*. To choose between these two contentions at the pleading stage is impermissible. The issue must be resolved at trial. One of the paragraphs of Count I reads:

> Froggatt knew or should have known that its certified financial statements would be used by third persons such as plaintiff as a basis for business decisions involving General Auto Replacement, Inc.

This count, liberally interpreted, alleges a class of insurance companies which, like Merit, could provide the kind of insurance policies General Auto sold. Thus, the complaint was sufficient to withstand defendants' challenge that the complaint was defective for want of facts showing that they knew of a limited class that might rely on the audit report. In all other respects the complaint met the requirements of Fed.R. Civ.P. 8(a). *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see e. g.*, *Eyerly Aircraft v. Killian*, 414 F.2d 591, 603 (5th Cir. 1969). Illinois procedure requires a plaintiff allege freedom from contributory negligence. The complaint contains no such allegations. But the allegation was unnecessary because under Fed. R.Civ.P. 8(c) contributory negligence is an affirmative defense which a defendant, not a plaintiff, must plead.

With respect to Count Two, Illinois does not recognize gross negligence as an independent ground for recovery. *C.R.I. & P. Ry. v. Hamler*, 215 Ill. 525, 74 N.E. 705 (1903). Accordingly, the trial court did not err in dismissing Count Two.

Plaintiff contends that the trial judge erred in refusing to require Anthony Colao, one of the defendants, to complete his depo-

sition and that such refusal, under the circumstances, was a manifest abuse of discretion. We need not recite those circumstances because we believe the problem should, if the occasion demands, be reviewed and ruled upon anew by the district court at the new trial.

Because we remand for a new trial, we deem it unnecessary to comment on the numerous allegedly erroneous evidentiary rulings by the trial judge (other than those to which we have alluded in general terms in Part II).

The judgment of the district court is reversed and vacated. The cause is remanded for a new trial under the provision of Circuit Rule 18.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting in part.

The majority view of this case was my initial view since it appeared that jury questions had been appropriated by the trial court.[1] That remains a reasonable view, but after considering the case further I have come to the conclusion that plaintiff failed to establish a *prima facie* case as to Count III. In reaching that conclusion, I have given consideration not only to the evidence which was admitted, but also to that which was excluded.

Neither party challenges the applicability of Illinois law. The leading Illinois case determining the standard for the direction of verdicts as well as entry of judgments n. o. v. is *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill.2d 494, 229 N.E.2d 504 (1967), in which Mr. Justice Underwood in an exhaustive opinion resolved the issue. The case remains a current statement of Illinois law. *See Bailey v. City of Decatur*, 49 Ill.App.3d 751, 7 Ill.Dec. 452, 364 N.E.2d 613 (4th Dist. 1977). The stated rule, as the majority notes, is that "verdicts ought to be directed and judgments n. o. v. entered only in those cases in which all of the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors movant

that no contrary verdict based on that evidence could ever stand." *Pedrick*, 37 Ill.2d at 510, 229 N.E.2d at 513–14. However as a prelude to stating the rule, the Illinois Supreme Court commented:

> Clearly, the constitution does, and judges should carefully preserve the right of the parties to have a substantial factual dispute resolved by the jury, for it is here that assessment of the credibility of witnesses may well prove decisive. (See Ill. Const. art. II, sec. 5; Note, 107 U.Pa.L. Rev. 217.) But the presence of *some* evidence of fact which, when viewed alone may seem substantial, does not always, when viewed in the context of all of the evidence, retain such significance. As the light from a lighted candle in a dark room seems substantial but disappears when the lights are turned on, so may weak evidence fade when the proof is viewed as a whole. Constitutional guaranties are not impaired by direction of a verdict despite the presence of some slight evidence to the contrary (*Chamberlain*; Blume, "Origin and Development of the Directed Verdict," 48 Mich.L.Rev. 555, 576–7), for the right to a jury trial includes the right to a jury verdict only if there are factual disputes of some substance.

37 Ill.2d at 504–05, 229 N.E.2d at 510. It must also be borne in mind that allegations of fraud, as distinguished from the ordinary civil case, must be established by clear and convincing evidence. *Ray v. Winter*, 67 Ill.2d 296, 10 Ill.Dec. 225, 367 N.E.2d 678 (1977); *Mack v. Earle M. Jorgensen Co.*, 467 F.2d 1177 (7th Cir. 1972); *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 463 (7th Cir. 1968); *Hubert v. May*, 292 F.2d 239 (7th Cir. 1961). In applying the Illinois rules, viewing the evidence most favorably to plaintiff, we are to decide only whether the plaintiff had made out a *prima facie* case so as to justify permitting a properly instructed jury to make the ultimate factual determinations.

---

1. Much of the delay in the resolution of this case on appeal results from the change of my initial view.

Plaintiff's obviously heavy burden was to affirmatively establish against these particular defendants a *prima facie* case as to each and every one of the required fraud elements. No aspect of the fraud allegations could be presumed. *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 751 (7th Cir. 1966). No evidence was received on damages, as that issue had been reserved by the trial court. In the business relationships between all these parties, it is evident that there was fraud, fraud against plaintiff by Lebowitz, president of General, and by Lebowitz and Leatherby together against plaintiff. The present case against these defendants is only one aspect of the litigation generated elsewhere by these activities.

One of my concerns with this case was the extraordinary success of defendants in excluding plaintiff's evidence. Almost all of defendants' objections were allowed. In objecting to the admission of plaintiff's documentary evidence, defendants were even more successful as all or almost all their objections were sustained. The result was that plaintiff was required to make numerous offers of proof, possibly well over a hundred. I do not view it as necessary to delve individually into the mass of evidentiary rulings. Some of those evidentiary rulings I consider to have been in error, but I have approached this case on the broader basis by assuming that the more important excluded evidence had been admitted. At best the evidence tells the story of careless auditing by defendants and the devious intentions of Lebowitz and Leatherby. However, viewing all the evidence most favorably to plaintiff, a *prima facie* case of fraud against these defendants, even with a liberal use of inferences, was not established. Nothing short of pure speculation could save the plaintiff's case, and neither a jury nor ourselves may indulge in that.

Let us look further at the individual defendants. Colao was a partner and as head of Froggatt's New York office signed the audit on behalf of the firm. Had his deposition been admitted, which I will consider later, it would, as far as it was completed, show nothing more than negligence in his review of the finished audit. Johnson, Ginsburg and Miller were named merely in their capacities as partners of the firm, although Miller who had been an employee became a partner only after the audit was completed. Cable and Sexton were also employees. Sexton had spent a few hours assembling documents in connection with the audit. Cable, a senior accountant, and another accountant not presently involved, did the audit field work. What they came across in their audit was reported to their superiors, usually Smith. Smith, however, is of more interest and significance.

Smith, not a CPA, was head of Froggatt's Philadelphia office. He had previously done work for a prior company controlled by Lebowitz in which some financial problems had also developed. They became personal friends and maintained their business and personal relationship after General was formed. When problems also developed in General, Smith suggested that Lebowitz form his own insurance company as a substitute for Leatherby. Lebowitz offered Smith the position of treasurer, along with stock in any newly organized insurance company, provided the financial statements to be prepared reflected a favorable picture and the public stock offering was successful. Smith was interested. Lebowitz also mentioned the possibility of finding an existing insurance company as a substitute for Leatherby. Subsequently Smith assured Lebowitz that he would provide the best financial statement possible. In the first draft submitted to Lebowitz, some entries were based on a loss ratio which Lebowitz found unacceptable. This was favorably revised by Smith by applying what he termed "the rule of reason." After this 1970 audit was completed, Lebowitz, abandoning his own insurance company idea, decided to try to interest some other insurance company to replace Leatherby. He discussed a prospect list of about 250 insurance companies with Smith. Financial problems continued to develop in General, which also came to Smith's attention. General arranged for another firm to do the audit for 1971, but that audit was not completed.

It is arguable whether any untrue material fact was actually stated in the audit, but I view that as a jury issue. It is also arguable that if it contained an untrue material fact that it was known to be untrue, but I view that also as a jury issue. It is, however, considerably less arguable that plaintiff had any right to rely upon the audit and did in fact rely upon it.

Stern, the president of plaintiff, claims he relied on the audit as a basis for his entering a contract with General. There is no substantial evidence to that effect, only Stern's self-serving conclusion. According to him, he relied on the 1970 audit in June 1972 when contracting with Lebowitz and again in October of 1972 when contracting with Leatherby and Lebowitz. The financial information prepared by Froggatt was already 16 months old when Stern first received it. There was no privity between Stern and Froggatt. The audit had not been proposed specifically for Stern's use, but for a possible public stock offering or for use with numerous companies. That possible use does not constitute use only by a limited class of persons. During this time it also came to Stern's attention that Lebowitz had been indicted by federal authorities in New York. Stern also became aware that there was pending litigation between General and Leatherby. Stern did some independent checking but it was surprisingly limited, shallow and deficient. Stern was a lawyer and a CPA with insurance experience. Considering the evidence admitted and offered, Stern's own poor business judgment should not be converted into a *prima facie* case of fraud by these accountants.

The Illinois law as to reliance is stated in *Schmidt v. Landfield*, 20 Ill.2d 89, 94, 169 N.E.2d 229, 231–32 (1960):

As a general rule one who is guilty of fraudulent misrepresentation cannot interpose a defense that the person defrauded was negligent in failing to discover the truth. The general rule is subject to the qualification, however, that the party seeking relief had a right to rely upon the representation made. This

court has pointed out accordingly that "In all cases where it is sought to hold one liable for false representations, the question necessarily arises, whether, under all circumstances, the plaintiff had a right to rely upon them. In determining this question, the representations must be viewed in the light of all the facts of which the plaintiff had actual notice, and also of such as he might have availed himself by the exercise of ordinary prudence." The rule is well established that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations. (Citations omitted.)

Stern was chargeable with knowledge.

The final fraud issue requires proof that the false material fact was made for the purpose of inducing the other party to act. Plaintiff clearly failed to establish a *prima facie* case on this aspect also. Smith knew that Lebowitz wanted to start his own insurance company by a public stock offering or to seek a replacement insurance company for Leatherby. There is, however, no substantial evidence which would expand Smith's general knowledge of Lebowitz' possible general purposes into a *prima facie* finding that the audit was for the purpose of "inducing" plaintiff to act at a much later date. Smith's activities evidence nothing more than a possible conflict of interest arising out of the job offer possibility, careless supervision of the audit, and a close relationship with Lebowitz, his client, whom he made some effort to please. It doesn't add up to a *prima facie* case of fraud.

Plaintiff had four months of trial in which to try to establish a *prima facie* case of fraud. Perhaps some judges would have played it safe and permitted the jury an opportunity to consider the case. If the

jury, however, had brought in a fraud verdict for plaintiff, it could not have been permitted to stand. The evidence of fraud was considerably less than clear and convincing.

Plaintiff objects that it was not permitted by the trial court to use the incomplete deposition of defendant Colao, a partner of Froggatt in New York, who signed the audit for the firm with little knowledge about its preparation. There was no need for the majority to consider this issue. The deposition began on June 27, 1977, and resumed on September 13, 1977. On September 23, 1977, plaintiff gave notice of the continuation of the deposition for October 4, 1977. On that date Colao was out of the country. In any event there were five other depositions previously scheduled for that date. Trial had been set for October 11, 1977. Between September 23 and October 31, 1977, there were more than 60 depositions already scheduled. On October 11, the trial was rescheduled to October 18. Also on October 11, 1977, plaintiff served notice to continue the deposition on October 14, 1977. On October 14, 1977, there were already three other depositions previously scheduled in New York and Chicago. Subsequently, in the ninth week of trial, plaintiff attempted to use the incomplete Colao deposition. The deposition had not been filed in accordance with Rule 30(f) of the Federal Rules of Civil Procedure or with local Rule 18. The trial court also noted that plaintiff had had over two years in which to complete discovery. I find no error in the court's ruling under these particular circumstances. Plaintiff argues that the Colao testimony was "crucial," but gives us little insight as to how it was crucial. At most it was only evidence of Colao's negligence.

There remains the issue of the pretrial dismissal of Counts I and II which alleged negligence and gross negligence. Defendants argue that defendants as accountants cannot be liable to plaintiff for negligence unless in privity with plaintiff or unless defendants could foresee that plaintiff would rely on the audit. There was, defendants argue, no duty of reasonable care owing plaintiff by defendants. Further defendants argue that plaintiff did not disclaim its own lack of contributory negligence.

Looking to Illinois law, both parties find support in *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969). In that case a land surveyor hired by a prior owner of the real estate was held liable to a third party purchaser of the real estate who acted in reliance on the survey. It was held in the circumstances of that case that privity of contract was not applicable and did not bar recovery. The court in coming to that conclusion pays particular attention to the opinion of Mr. Justice Cardozo in *Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441 (1931), considered to be a leading case on the issue of accountant's liability. It was held in *Ultramares* that no cause of action would lie for negligence to third parties who had loaned money to an insolvent firm in reliance on the defendant's audit. Mr. Justice Cardozo wrote:

> If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate class. The hazards of a business conducted in these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.

225 N.Y. at 179, 174 N.E. at 444.

In *Rozny* the Illinois Supreme Court commented, "We agree that the unknown and unlimited liability factor, as so ably stated by Mr. Justice Cardozo in the *Ultramares* case, is not to be lightly discounted. But we deal here with a defendant who has included in his inaccurate plat an 'absolute guarantee for accuracy.'" 43 Ill.2d at 66, 250 N.E.2d at 662. The court then carved out an exception specifically setting forth these factors as controlling:

> (1) The express, unrestricted and wholly voluntary "absolute guarantee for accuracy" appearing on the face of the inaccurate plat;

(2) Defendant's knowledge that this plat would be used and relied on by others than the person ordering it, including plaintiffs;

(3) The fact that potential liability in this case is restricted to a comparatively small group, and that, ordinarily, only one member of that group will suffer loss;

(4) The absence of proof that copies of the corrected plat were delivered to anyone;

(5) The undesirability of requiring an innocent reliant party to carry the burden of a surveyor's professional mistakes;

(6) That recovery here by a reliant user whose ultimate use was foreseeable will promote cautionary techniques among surveyors.

43 Ill.2d at 67–68, 250 N.E.2d at 663.

In Count I, plaintiff alleges that "Froggatt knew or should have known that this certified audit would be viewed and relied upon by third parties including plaintiff." I do not believe that the allegation brings plaintiff within the *Rozny* exception requiring a showing of liability to a comparatively small group. Had plaintiff amended these allegations to conform to its own proof, the group would be seen not to be small. It would have included, as we have already noted, the general public as Lebowitz was considering forming a new insurance company with a public stock offering. It would also have included several hundred insurance companies as prospects to substitute for Leatherby. The Illinois Supreme Court also took particular note of the survey's written guarantee of absolute accuracy, which is not claimed in the present case. Nor is there any allegation a corrected audit was prepared, but not distributed. We find no indication in the Illinois law that persuades us that Illinois is ready to broaden the liability of accountants to encompass the situation in this case.

It is recognized in Illinois that the plaintiff has the burden of proof in showing the absence of contributory negligence. However, Rule 8(c) of the Federal Rules of Civil Procedure is considered to be applicable and includes contributory negligence as an af-

firmative defense. That being so, plaintiff need not allege due care, but lack of contributory negligence nevertheless remains a matter of plaintiff's proof. Though the plaintiff did not have to allege freedom from contributory negligence, plaintiff would still have had to explain away its reliance upon an outdated audit. The plaintiff, therefore, is in no position to complain about the negligence of defendants that there may be seen in the evidence. It is somewhat of an anomaly that what the defendant must allege, the plaintiff must prove. On this issue I would adopt the reasoning of Judge Foreman in *Gilmore v. Witschorek*, 411 F.Supp. 491 (E.D. Ill. 1976), and his consideration of the authorities cited therein.

As to Count II, the gross negligence count, we are given no support for plaintiff's view that gross negligence exists in similar cases as a separate cause of action in Illinois. It is generally considered that Illinois does not recognize degrees of negligence as distinguished from wilful and wanton conduct. As to Count II, I do not dissent, but I respectfully dissent from the majority view on Counts I and III.