**Ronald H. SELLE, Plaintiff,**

v.

**Barry GIBB, Robin Gibb, and Maurice Gibb, a/k/a the Bee Gees, Brothers Gibb B.V., Phonodisc, Inc. (now known as Polygram Distribution, Inc.,) and Paramount Pictures Corp., Defendants.**

**No. 78 C 3656.**

United States District Court,
N.D. Illinois, E.D.

July 8, 1983.

Allen C. Engerman, Engerman, Erlich, Jacobs & Berman, Ltd., Chicago, Ill., Jerrold Gold, Granett & Gold, P.C., New York City, for plaintiff.

Robert C. Osterberg, Abeles, Clark & Osterberg, New York City, Robert W. Bergstrom, Bergstrom, Davis & Teeple, Chicago, Ill., for defendants.

## Memorandum

LEIGHTON, District Judge.

This is a suit brought under the federal copyright laws to recover for the alleged infringement of a musical copyright; jurisdiction is conferred on this court by 28 U.S.C. § 1338(a). The trial, as demanded by the plaintiff, has been with a jury which, after hearing evidence limited to the issue of liability, returned a verdict in his favor on the copyright infringement claim. Defendants now move for judgment notwithstanding the verdict, or in the alternative for a new trial; and in the event both motions are denied, for a section 1292(b) certificate authorizing an immediate appeal.

Several contentions are made in support of the motion for judgment *non obstante*, all of them attacking the evidentiary sufficiency of the verdict. One of these, as it has been met by the plaintiff, raises an issue which when resolved is dispositive, in this court at least, of the controversy between the parties. It is whether the verdict in plaintiff's favor can stand when there was no credible evidence before the jury that defendants ever had access to his musical composition, when defendants offered their uncontradicted and corroborated testimony of non-access, when defendants and others gave positive testimony that detailed the circumstances under which they independently created their song, and plaintiff's evidence supporting the theory that defendants copied his song consisted of a stereo tape recorded comparison of the two songs, comparative analytical graphs, charts and the testimony of an expert, uncontradicted by any other expert, that defendants' accused song is so strikingly similar to the plaintiff's as. to preclude coincidence, independent creation, or prior source. The following are the facts which the jury must have found from the evidence it heard, and which give rise to this and the other issues.

## I

The plaintiff in this case, Ronald H. Selle, lives in Hazelcrest, Illinois and is an antiques dealer, a part-time musician, a composer of popular songs and religious music. In the fall of 1975, he was a clothing salesman for Carson, Pirie, Scott in Chicago. One morning, as he was shaving, getting ready to go to work, a melody came to his mind; he reduced what had occurred to him to writing. While at work that day, he developed the melody further; and that night, at home, he sat at a piano and completed the song, adding chords to it. By the end of the night, Selle had the song written in notation; thus, its composition was completed within one day. After writing the music, during the following week, he composed the lyrics and reduced the song to its final form. No one assisted him either in composing the music, or in writing the words, or in phrasing the lyrics. He did not copy from any prior musical work or composition. He named his song "Let It End"; and after preparing a lead sheet, he obtained a copyright for it, issued to him by the Copyright Office on November 17, 1975.

At the time Selle composed this song, he had a small band of musicians with whom he played at local engagements. On two or three occasions the band performed "Let It End". Shortly after receiving the copyright, Selle invited his fellow musicians to a studio where the song was tape recorded, with Selle singing the words. Sometime thereafter, within a year or so, Selle caused eleven copies of the tapes and the lead sheet of the music to be sent to eleven music recording and publishing companies. Eight of these returned Selle's materials to him; three did not respond. Selle's song "Let It End" was never reproduced by any music company; it never was recorded by any recording company or artist; the lead sheet to "Let It End" was never published, purchased by or sold to anyone. The only

time Selle's song was ever publicly performed was on the two or three occasions his own band played it at a local engagement in the Chicago area.

One day, in May 1978, Selle was working in the yard of his home when he heard a teenager next door playing a stereo cassette rather loudly. Selle thought it was his song "Let It End" that he heard playing, except there "were different words to it and it was a different rendition." When Selle asked the teenager, he was told the song that had attracted his attention was "How Deep Is Your Love", soundtrack music from the well known movie, a box office hit, "Saturday Night Fever." Later, he examined the jacket or container of the cassette and noticed that credit for creating the music he thought was his was claimed by the Bee Gees. A short time afterwards, Selle saw "Saturday Night Fever"; again he heard portions of music he thought was his song "Let It End", but without his lyrics. Paramount Pictures Corporation made and distributed the movie; the other corporate defendant, Phonodisc, Inc., now known as Polygram Distribution, Inc., made and distributed the cassette tape of "How Deep Is Your Love", the accused song.

The Bee Gees are three brothers, Maurice, Robin, and Barry Gibb, who began as a group in 1955 and have become internationally known as musical artists, originators and singers of popular songs. Although they do not read or write music, they have composed more than 160 songs which because of their unique singing and playing style have become popular through public performances, in the sale and distribution of music sheets, cassette tapes, records, and albums, some of which have sold in excess of 30 million copies. Most of the albums and other musical products of their singing style have been distributed worldwide.

The Bee Gees have performed concerts throughout the United States and in many foreign countries. They have received awards nationally and internationally in recognition of their talent as artists and for the quality of the music they have created and played. Throughout their career of more than 25 years, no one, before this suit was filed, has ever accused them, any one of them, or anyone associated with them, of having appropriated, copied, or plagiarized anyone else's song or composition. And because they do not write music, the Bee Gees employ others who do. When they conceive a song, they use a tape recorder; and after they have put a song on tape, members of their staff prepare from it scores and reduce the composition to a form that can be duplicated for sale, used in obtaining a copyright, and performed publicly by the Bee Gees and others.

In January 1977, the Bee Gees, their wives, and certain members of their staff, together with representatives of music publishing companies, went to a recording studio located in the Chateau d'Herouville near Pontoise, a remote village in France about 25 miles northwest of Paris. They were there "to mix a live album and to write a few songs." Among those with them were Albhy Galuten, Carl Richardson, Derek Blue Weaver, Dennis Brian, Allen Candle, Bee Gees manager Dick Ashby, and Tom Kennedy. The Bee Gees did the album; and they composed six or more new songs. Barry Gibb has described, under oath, the recording session in the French chateau; in most details of his testimony, he has been supported by the testimony of his brothers, Dick Ashby, Albhy Galuten, and Blue Weaver.

Weaver, at the time of the recording session, was employed by the Bee Gees as a musician, a keyboard player, and at times, in production. Late one afternoon in January 1977, just before dinner at the chateau, he was seated at a piano when, he has told the jury, Barry Gibb said to him, "Play me a beautiful chord." Weaver claims, under oath, that he thought "It was our intention to write a ballad." He has sworn that he and Barry Gibb began to throw, back and forth, ideas about a song, with him playing a few chords. He has testified that Barry

"would say, 'What was that you just played' and I would play it again. He [Barry Gibb] would say—he would sing a melody note, and I would try and find a corresponding chord to that, until he said, 'Yes, that's a nice one. We will use that.'" In this way, Weaver has said, without anyone in this trial contradicting him, the song "How Deep Is Your Love" was created. Everyone connected with the defendants in this case has sworn, and no contradictory testimony has been offered, that at no time before this musical creation did either Weaver or any of the Bee Gees have access to plaintiff's song "Let It End." The work tape that Weaver and Barry Gibb used to record the initial creation of the accused song has been admitted in evidence. Barry Gibb has testified to the circumstances under which the work tape was made, how his brothers later joined in finishing the accused song; and Weaver has explained how he found the tape among cassettes he took to London with him early in February 1977 from the recording session at the chateau. By listening to the tape, one can actually hear the voices of Blue Weaver and Barry Gibb; one is admitted into the creative process by which the accused song, according to defendants, was composed.

After completing the accused tape, the Bee Gees, through their staff, caused to be made what in the jargon of their profession is called "a demo tape". This tape, although containing a rendition of "How Deep Is Your Love", has different notes and a melody different from a March 6, 1977 lead sheet of the same song. The demo tape is in the key of E flat, as is the work tape; the lead sheet is in the key of E. A vocal-piano version taken from the demo tape is also in the key of E flat.

On March 7, 1977, a lead sheet of "How Deep Is Your Love" was filed for issuance of a United States copyright. Later in November 1977, a piano-vocal arrangement of the song was filed in the Copyright Office. Other than pointing to the fact that the work tape has an unexplained gap in the beginning, and to differences in the keys of the demo tape, the lead sheet, and the piano-vocal arrangement, plaintiff does not dispute nor contradict any of defendants' evidence concerning their nonaccess to his song or their evidence that in January 1977 in the Chateau d'Herouville in France they independently created "How Deep Is Your Love".

However, to prove his claim that the Bee Gees copied his song, Selle obtained an analytical and comparative study of "Let It End" and defendants' "How Deep Is Your Love" from an expert, Arrand Parsons, a professor of music at Northwestern University and a doctor of philosophy in music theory from that institution. Mr. Parsons has been at Northwestern since 1946; he has held academic positions at that school and others. He is a music theorist; his professional work has been concentrated in classical music. The emphasis of his study has been in harmony, counterpoint, form and analysis, orchestration, and fugue. For some 25 or more years, Mr. Parsons has been a program annotator for the Chicago Symphony Orchestra. He has done the same kind of work at Ravinia, an international musical festival at Highland Park, Illinois. He has also prepared program notes for the New Orleans Symphony Orchestra; he was co-author of a two-volume work on music theory. Mr. Parsons has written articles published in foreign quarterlies whose subjects are contemporary music. He has been an interview commentator for a local fine arts radio station in Chicago concerned with classical music. Prior to his involvement in this case, he has never made a comparative analysis of two popular songs. In this case, he was asked to compare "Let It End" with "How Deep Is Your Love" in order to see what similarities exist between them; his analysis and comparison were based on materials furnished him by plaintiff and his counsel.

Under Mr. Parsons' guidance, graphs and charts were prepared which visually show the notes of the two songs and how they

appear when compared with each other. A musical producer in Hollywood, California was employed by the plaintiff, and under Mr. Parsons' directions, the producer and four session musicians made a comparative recording of the two songs. From the materials furnished by the plaintiff, supplemented by the graphs, charts and the recording, Mr. Parsons gave the jury a detailed explanation of "Let It End" and "How Deep Is Your Love", their similarities in both pitch and rhythm.

According to this expert, the first eight bars of each song (Theme A) have twenty-four notes out of thirty-four and forty notes in plaintiff's and defendants' compositions, respectively, that are identical in pitch and symmetrical positions. Out of thirty-five rhythmic impulses in plaintiff's composition and forty in defendants', thirty are identical. In the last four bars of both songs (Theme B), fourteen notes in each are identical in pitch. Of the fourteen rhythmic impulses in Theme B of both songs, eleven are identical. Finally, both Theme A (the first eight bars) and Theme B (the last four bars) occur in the same position in each composition.

Based on his structural analysis of the two songs, coupled with his detailed analysis of the melodies of Themes A and B in both of them, Mr. Parsons gave his opinion that the two songs could not have been independently created; that they were "strikingly similar." When asked whether he knew of any two musical compositions by two different composers, "that contain as many striking similarities as exist between Ronald Selle's song 'Let It End' and the Bee Gees song, 'How Deep Is Your Love'", Mr. Parsons answered, "I do not." But on several occasions he refused the opportunity to say that the similarities between plaintiff's and the accused song could only have come from copying. No expert testified for defendants.

Maurice Gibb was then called by the plaintiff as an adverse party witness. He was asked whether he had given a deposi-

tion in this case during which a tape containing an example of music had been played. Gibb acknowledged that there had been such an occasion. The same tape was then played; Gibb was asked could he "identify that example as being from any piece of music that you are familiar with?" He said he could. When asked, "And what is that?" Gibb answered, "I believe that's 'How Deep Is Your Love.' Yes, I'm sure its 'How Deep Is Your Love.'" Counsel for the plaintiff then read a stipulation of the parties that the music which had been played to Maurice Gibb was "the melody of Theme B, the first two phrases of Ronald Selle's 'Let It End.'" Plaintiff rested his case in chief. Defendants put on their defense. They did not call an expert witness to testify.

## II

Relying heavily on this fact, plaintiff contends that his case against defendants is not based on evidence of direct access by them to his song; it is "based on inferred access established by 'striking similarities.'" He argues that the testimony of his expert Arrand Parsons disclosed a thorough analysis and comparison of "Let It End" and "How Deep Is Your Love", supported by the statement that he did not think it humanly possible for the accused song to have been independently created, testimony which no other expert contradicted, denied, or rebutted; that the charts and comparison tapes demonstrated near identity of the two songs on a note-by-note, measure-by-measure basis as to 12 of the 26 bars of defendants' "How Deep Is Your Love"; that the two songs were played for the jury on numerous occasions by the parties, thus giving them ample opportunity to decide the case, not only on expert testimony and charts, but also by hearing the similarity that exists in the two songs; that the overwhelming similarities prompted Maurice Gibb, one of the defendants, and a Bee Gee, to identify plaintiff's song as his own; and that defendants' evidence concerning origi-

nality of their composition was conflicting and tainted by discrepancies in the musical notations submitted to the Copyright Office. Plaintiff insists, and asks this court to conclude, that there was substantial evidence heard by the jury to support its verdict in his favor. Therefore, he urges this court to deny defendants' motion for judgment notwithstanding the verdict.

Defendants, on the other hand, contend that plaintiff misunderstands the function of the inference of access which he claims has been established by the striking similarities that exist between the two songs. They argue that in this case any inference of access, and thus of copying, has been rebutted by plaintiff's concession that he has no proof of defendants ever having access to his song before they composed "How Deep Is Your Love", by their uncontradicted showing of nonaccess, and by their positive evidence of how they composed the accused song. To further support their position, defendants argue that the issue whether the evidence on which the jury based its verdict supports its implicit findings of originality, copying, access, striking similarity, and substantial similarity, is one of law for decision by this court on their motion for judgment *non obstante;* that access is the way by which copying of an allegedly infringed work is proved, but speculation on this important point should not be permitted a jury; that the verdict in this case is not supported by the degree of substantial evidence which meets the legal tests of "striking similarity" that would be a substitute for proof of access; and more importantly, plaintiff's witness Arrand Parsons was not a qualified expert, the reason, according to defendants, why they did not call an expert witness. Therefore, defendants urge this court to grant their motion for judgment *non obstante* because the verdict of the jury is contrary to the evidence and the law.

### III

▉ Judgment notwithstanding the verdict is nothing more than a directed verdict granted after, rather than before, the jury has had an opportunity to bring in a verdict, *Lester v. Dunn,* 475 F.2d 983, 985 (D.C.Cir.1983); the questions raised are the same. *Shaw v. Edward Hines Lumber Co.,* 249 F.2d 434, 437 (7th Cir.1957). The criteria for the two motions are identical: all evidence must be viewed in the light most favorable to the nonmoving party. However, a party is not entitled to the benefit of unreasonable inferences or those "at war with the undisputed facts." *Schneider v. Chrysler Motor Corp.,* 401 F.2d 549, 555 (8th Cir.1968); *Marcoux v. Van Wyk,* 572 F.2d 651, 653 (8th Cir.1978). *Alden v. Providence Hospital,* 382 F.2d 163, 165 (D.C.Cir. 1967).

▉ A verdict should be directed, or a motion for judgment notwithstanding the verdict should be granted, only where evidence, with all inferences justifiably deducible therefrom, does not justify a verdict in favor of the party producing the evidence. *Hohmann v. Packard Instrument Company, Inc.,* 471 F.2d 815, 819 (7th Cir.1973). A mere scintilla of evidence is not enough to require the denial of a motion for directed verdict, or the sustaining of a verdict in favor of a nonmoving party, if one has been returned. *Gunning v. Cooley,* 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720 (1930); *Hubert v. May,* 292 F.2d 239, 244 (7th Cir. 1961); *cf. Chillicothe Sand & Gravel v. Martin Marietta Corp.,* 615 F.2d 427, 430 (7th Cir.1980). It is entirely immaterial that at the close of all the evidence the court denied the motion for a directed verdict and sent the case to the jury. *Wright v. Atchison, Topeka & Santa Fe Railway Co.,* 254 F.Supp. 308, 309 (W.D.Mo.1966); *Donald v. Uarco Business Forms,* 344 F.Supp. 338, 339 (W.D.Ark.1972), *aff'd,* 478 F.2d 764 (8th Cir. 1973).

In fact, the practice of a trial judge submitting the case to a jury for verdict, even though the evidence appears insufficient, is generally approved. *See Green v. Reynolds Metals Company,* 328 F.2d 372, 373 (5th Cir.1964); *Fratta v. Grace Line, Inc.,* 139

F.2d 743, 744 (2d Cir.1943). This procedure is based on the idea that the judge, during the trial, may not have the time to thoroughly review the questions of law that may arise. *Ortiz v. Greyhound Corp.,* 192 F.Supp. 903, 905 (D.C.Md.1959). There is no doubt that in most cases it is in the best interest of efficient judicial administration for the trial judge to refrain from considering a motion for a directed verdict in favor of deciding a motion for judgment n.o.v. *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 166 (2d Cir.1980). Federal courts of appeals have repeatedly stated it is best for a judge to take the verdict, and then pass on the sufficiency of the evidence in a post-verdict motion, i.e., a motion for judgment n.o.v. The rationale of this principle is aptly set forth in 9 Wright & Miller, *Fed.Pract. & Procedure,* § 2533 at 585–86 (1971):

> If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial. *Id.* at 586.

This principle has been followed, and as a consequence, plaintiff's right to have a jury pass on his claim of copyright infringement has not been foreclosed. *Yeager v. J.R. Christ Co.,* 364 F.2d 96, 100 (6th Cir.1966). Now that the jury has ruled in his favor, the court, on defendants' motion for judgment *non obstante,* will proceed to determine whether the evidence, with all infer-

ences justifiably deducible therefrom, constitutes a sufficient basis for the jury's verdict. *Hohmann v. Packard Instrument Company, Inc.,* 471 F.2d at 819; *cf. Lapsley v. American Institute of Certified Public Accountants,* 246 F.Supp. 389, 390 (D.C.D.C. 1965). The appropriate starting point is the copyright infringement claim made in the complaint.

Plaintiff alleges that on November 17, 1975 the Register of Copyrights issued to him a Certificate of Copyright Registration for his song "Let It End"; and that "[t]he music to 'How Deep Is Your Love' is represented as being written by the Bee Gees but the music was in fact copied largely from plaintiff's copyrighted musical composition...." Having made these allegations, plaintiff had the burden of proving that the accused song was copied from his copyrighted work, and that the Bee Gees unlawfully appropriated protected material from his copyrighted music. *Cf. Scott v. WKJG, Inc.,* 376 F.2d 467, 469 (7th Cir. 1967), *cert. denied,* 389 U.S. 832, 88 S.Ct. 101, 19 L.Ed.2d 91 (1967). To quote a reliable authority on the subject, "[a]s the term 'copyright' suggests, it is the act of copying which is essential to, and constitutes the very essence of all copyright infringement." 2 Nimmer On Copyright, § 8.02[A], p. 8–22 (1982). Thus absent copying there can be no infringement of copyright, *Mazer v. Stein,* 347 U.S. 201, 218, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954), regardless of the extent of similarity, *Arnstein v. Edward B. Marks Music Corporation,* 82 F.2d 275 (2nd Cir. 1936); *Stratchborneo v. Arc Music Corp.,* 357 F.Supp. 1393, 1402 (S.D.N.Y.1973); 2 Nimmer on Copyright, § 8.01[A], p. 8–10 (1982), and regardless of the fact that the accused composition and the copyrighted material are identical. *Cf. Fred Fisher, Inc. v. Dillingham,* 298 F. 145, 147 (S.D.N.Y. 1924); *see Alfred Bell & Co. v. Catalda Fine Arts,* 191 F.2d 99, 103 (2d Cir.1951); 1 Nimmer on Copyright § 2.01[A], p. 2–8 (1982).

In this case, the parties agree that plaintiff is the owner of the copyright to

"Let It End", and that his music was copyrightable. Consequently, the focus of the controversy between them is on whether defendants had access to plaintiff's music, and thus the opportunity to copy it. To recover for infringement of his copyright on the theory that his song was copied by the Bee Gees, plaintiff had the burden of proving that they had access to his song before they composed "How Deep Is Your Love." *Twentieth Century Fox Film Corp. v. Dieckhaus*, 153 F.2d 893, 899 (8th Cir.1946); *Jackson v. Washington Monthly Co.*, 481 F.Supp. 647, 649 (D.C.D.C.1979), *aff'd*, 675 F.2d 1340 (D.C.Cir.1982); *cert. denied*, —— U.S. ——, 103 S.Ct. 215, 74 L.Ed.2d 172 (1982). Access is the opportunity that an alleged infringer has to see or hear the copyrighted work. *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir.1977). In the nature of things, one cannot copy the music of another, as plaintiff alleges the Bee Gees did in this case, unless there is access to the copyrighted work. For this reason, courts in copyright infringement cases attach great significance to the evidence of access. *See Sarkadi v. Wiman*, 43 F.Supp. 778 (S.D.N.Y. 1942), *aff'd*, 135 F.2d 1002 (2d Cir.1943); see *Whitney v. Ross Jungnickel, Inc.*, 179 F.Supp. 751, 753 (S.D.N.Y.1960). And they have held that reasonable opportunity of access does not mean the bare possibility. *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir.1978); *Testa v. Janssen*, 492 F.Supp. 198, 203 (W.D.Pa.1980). Access may not be inferred through mere speculation or conjecture. *Scott v. Paramount Pictures Corp.*, 449 F.Supp. 518, 520 (D.C.D.C.1978) *aff'd*, 607 F.2d 494 (D.C.Cir. 1979), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980); see 3 Nimmer on Copyright § 13.02[A], p. 13–12 (1982).

Plaintiff concedes he has no evidence that the Bee Gees, any one of them, or any one for them, ever had the opportunity either to have seen the score of his song, or to have heard it played. He admits that his music was never published by any company or recorded by any singing or playing group, or publicly performed by anyone other than his own small band on two or three occasions in the general area of Chicago, Illinois. The Bee Gees, each of them, supported by the testimony of three members of their staff, have categorically denied ever having heard about the plaintiff, or about his song before the recording session in the Chateau d'Herouville in France where, they say, "How Deep Is Your Love" was independently created by them. The possibility that one of the three companies which did not return plaintiff's musical materials furnished defendants with the opportunity to hear plaintiff's song, or see a score sheet of the music, is pure conjecture. It has been held that the mere fact a plaintiff's manuscript is physically in the same city in which the alleged infringer resides does not furnish the reasonable opportunity to view the manuscript and thus constitute access, notwithstanding the bare physical possibility of such viewing. *Columbia Pictures Corp. v. Krasna*, 65 N.Y.S.2d 67 (Sup. Ct.1946), *aff'd*, 271 App.Div. 1008, 69 N.Y. S.2d 796 (1947); *Higgins v. Woroner Prods., Inc.*, 161 U.S.P.Q. 384 (S.D.Fla.1969). Therefore, not only is there no evidence of access to plaintiff's song by defendants; plaintiff's proof refutes this possibility.

In addition to this important fact, and lending strength to it, defendants have each testified, and have offered corroborative testimony of witnesses, that they independently created "How Deep Is Your Love" at the Chateau d'Herouville in France in early January 1977, without ever having heard of plaintiff's song. With the exception of differences he detects between musical scale of the work tape that shows the process of creation by which defendants' song came into being, that of a lead sheet of the song, and that of a piano-vocal arrangement that was filed in the Copyright Office, plaintiff does not contradict defendants' evidence of how they created their accused music. In other words, other than these differences in musical scale to which plaintiff points, the testimony of de-

fendants, and that of their witnesses in this regard, stand uncontradicted. In considering this fact, the court must bear in mind that the law does not permit the oath of credible witnesses, testifying to matters within their knowledge, to be disregarded, particularly where lay persons give testimony contradicting existence of the ultimate fact to be inferred from the opinion of an expert. *See Chesapeake & O. Ry. Co. v. Martin,* 283 U.S. 209, 216, 51 S.Ct. 453, 456, 75 L.Ed. 983 (1931); *cf. Twentieth Century-Fox Film Corp. v. Dieckhaus,* 153 F.2d at 899; *Stafos v. Missouri Pacific Railroad Company,* 367 F.2d 314, 317 (10th Cir.1966).

Plaintiff, however, responds with the argument that defendants mistakenly "attempt to characterize [his] case as one based on direct access when, in fact, it was based on inferred access established by 'striking similarities'" which are found in the songs at issue. Plaintiff points to the fact that the jury heard the testimony of his expert Mr. Arrand Parsons, who stated categorically, without contradiction by any other expert for defendants, that the two songs were "strikingly similar", and that there were substantial similarities between plaintiff's song and the one composed by defendants. Further, throughout the trial the jury heard plaintiff's "Let It End" and defendants' "How Deep Is Your Love," played from original tapes to sophisticated renditions by accomplished musicians. From this evidence, particularly the expert testimony, plaintiff insists there is an inference to be drawn that defendants had access to his song, and thus the opportunity to have copied it.

 In the law of evidence, an "inference" is sometimes referred to as a "permissive presumption". *Washington v. Harris,* 502 F.Supp. 1267, 1271, *rev'd on other grounds,* 650 F.2d 447 (2d Cir.1981), *cert. denied,* 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982). This common evidentiary device permits a jury to find an ultimate fact to be true upon proof of another fact if upon consideration of all the circumstances revealed by the evidence they are satisfied that in logic and common experience the ultimate fact is more likely than not to follow from the fact proved. *McInerney v. Berman,* 473 F.Supp. 187, 188 (D.Mass.1979), *aff'd,* 621 F.2d 20 (1st Cir. 1980), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 85 (1980); *see County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979). An inference must be a logical and reasonable deduction from the facts proved. It may be unreasonable if it is "at war with uncontradicted or unimpeached facts." *Fenner v. General Motors Corp.,* 657 F.2d 647, 651 (5th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Daniels v. Twin Oaks Nursing Home,* 692 F.2d 1321, 1327 (11th Cir.1982). Where the case of a plaintiff is based on an inference or inferences, it must fail upon proof of undisputed facts inconsistent with such inference or inferences. *Trippy v. Sams,* 512 F.Supp. 5, 7 (E.D.Tenn.1980).

 In the case revealed by all the evidence which the jury heard, plaintiff's claim that the Bee Gees had access to his song, and thus copied it before they created "How Deep Is Your Love," is rebutted by the undisputed fact that defendants, before composing the accused song, had never heard of plaintiff or his music. Under this significant circumstance, it matters not, despite the testimony of plaintiff's expert, how strikingly or substantially similar are the two musical compositions. A work is original and may command copyright protection even if it is completely identical with a prior work providing it was not copied from such prior work but was rather the product of an independent effort of its author. *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090 (2d Cir.1977); 1 Nimmer on Copyright § 2.01[A], p. 2–8 (1982). Learned Hand, in his unique way of expressing a legal principle, once observed that:

[I]f by some magic a man who had never known it were to compose anew Keats'

Ode On a Grecian Urn, he would be an 'author' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats'. *Sheldon v. Metro Goldwyn Pictures Corp.,* 81 F.2d 49, 54 (2d Cir.1936), *aff'd,* 309 U.S. 390 [60 S.Ct. 681, 84 L.Ed. 825] (1940).

For these reasons, the inferences on which plaintiff relies is not a logical, permissible deduction from proof of "striking similarity" or substantial similarity; it is "at war with the undisputed facts", *Marcoux v. Van Wyk,* 572 F.2d 651, 653 (8th Cir.1978), and it is inconsistent with the proof of nonaccess to plaintiff's song by the Bee Gees at the time in question. *Trippy v. Sams,* 512 F.Supp. 5, 7 (E.D.Tenn.1980). Therefore, the verdict in plaintiff's favor cannot stand. *Twentieth Century-Fox Film Corporation v. Dieckhaus,* 153 F.2d at 893, (8th Cir.1946); *Bevan v. Columbia Broadcasting System, Inc.,* 329 F.Supp. 601 (S.D.N.Y.1971); *Cantor v. Mankiewicz,* 203 N.Y.S.2d 626 (1960). Accordingly, defendants' motion for judgment notwithstanding the verdict will be granted. An appropriate judgment order will be entered in conformance with Rule 50(a), Fed.R.Civ.P.

## IV

Defendants have moved, in the alternative, for a new trial pursuant to Rule 59(a), Fed.R.Civ.P. They advance three grounds in support of this motion. (1) It is argued that the verdict is against the weight of the evidence; (2) that the jury was improperly allowed to consider uncopyrighted versions of plaintiff's song "Let It End"; and (3), that the closing argument of plaintiff's counsel was prejudicial.

The rule under which this alternative motion is made provides, in pertinent part, that "[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." The subdivision of the rule under which this court has granted defendants judgment *non obstante,* provides, in pertinent part, that:

> If the motion for judgment notwithstanding the verdict provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.... Rule 50(c), Fed.R.Civ.P.

The authority to grant a new trial is delegated primarily to the discretion of this court. *General Foam Fabricators v. Tenneco Chemicals, Inc.,* 695 F.2d 281, 288 (7th Cir.1982). The tests to be applied in determining whether a motion for new trial should be granted are whether "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan,* 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940). It is said in 11 Wright & Miller, Federal Practice and Procedure, § 2803 p. 45 (1973 & Supp.1982) that "Rule 59 gives the trial judge ample power to prevent what he considers a miscarriage of justice. It is his right, and indeed his duty, to order a new trial as he deems it in the interest of justice to do so." *See Juneau Square Corp. v. First Wisconsin National Bank,* 624 F.2d 798, 806 (7th Cir. 1980).

Without implying lack of merit in the other grounds urged by defendants for a new trial, this court finds from a review of the record that the verdict in favor of the plaintiff is against the manifest weight of

the evidence and its return by the jury represents a miscarriage of justice. Therefore, as required by Rule 50(c), Fed.R. Civ.P., this court conditionally grants defendants a new trial in the event its ruling on the motion for judgment notwithstanding the verdict is hereafter vacated or reversed on appeal. The order to be entered will so provide.

So ordered.