**Alazar DESSIE, Plaintiff,**

v.

**GENERALE BANK, Defendant.**

**No. 90 Civ. 3366 (CHT).**

United States District Court,
S.D. New York.

Aug. 20, 1992.

Jonathan C. Moore, and Eckhaus & Olson, New York City (Steven G. Eckhaus, of counsel), for plaintiff.

Cleary, Gottlieb, Steen & Hamilton, New York City (Lawrence B. Friedman, Joshua H. Rawson, of counsel), for defendant.

## OPINION AND ORDER

TENNEY, District Judge.

This diversity case, brought under New York's Human Rights Law, N.Y.Exec.Law § 296 (McKinney 1982 & Supp.1992), involves a claim of employment discrimination on the basis of race and/or national origin. It was tried before a jury which found in favor of the defendant Generale Bank on plaintiff's claim of wrongful termination, but found in favor of the plaintiff Alazar Dessie and awarded him $200,000 on his claim that the defendant discriminated against him between May 16, 1988 and January 15, 1990 by inadequately compensating him. The jury also awarded the plaintiff damages for mental anguish in the amount of $40,000. Defendant Generale Bank has moved for entry of an order granting judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(b), on Mr. Dessie's claim of discriminatory treatment in the determination of his salary or, in the alternative, reducing the jury's award on that claim to not more than $84,000. Defendant also moves for judgment as a matter of law on Mr. Dessie's claim for damages for mental anguish. For the reasons set forth below, the motion is granted.

## BACKGROUND

Plaintiff Alazar Dessie is a Black man who, at the time of his employment by defendant, was an Ethiopian citizen. Tr. 97, 100; Pre-Trial Order ("PTO") § 5 ¶ 1. Defendant Generale Bank is a bank organized under the laws of Belgium whose head office is located in Brussels, Belgium. PTO § 5 ¶ 2. Generale Bank has branches throughout Belgium and operates in more than thirty countries. *Id.* In April 1984, Mr. Dessie was hired by Ian Messer, the Chief Executive Officer and General Manager of a recently established New York branch of Generale Bank, to assume the position of Group Vice President, Marketing. Tr. 108, 112; Ex. 2; PTO § 4, ¶ 1; § 6 ¶ 4-7. Mr. Dessie had initially worked with Mr. Messer at the Continental Illinois National Bank & Trust Co. and had later switched to The Gulf Bank, K.S.C. at Mr. Messer's invitation. Tr. 102, 104-05; PTO § 6 ¶ 2-3. At the same time that he hired Mr. Dessie, Mr. Messer also hired a man named Hans Neukomm to serve as the branch's Executive Vice President and Treasurer. PTO § 6 ¶ 8. As of at least February 1985, if not earlier, Patrick Speeckaert was also employed by the New York branch as the person in charge of the operations department. Tr. 117. Between April 1984 and May 1988, Mr. Dessie received two promotions—to Senior Vice President and then Executive Vice President—and five salary increases. Tr. 116, 124, 126, 133, 136.

In May 1988, Mr. Messer was relocated by Generale Bank to its London office. Tr. 137; PTO § 6 ¶ 21, 25. Upon Mr. Messer's reassignment, Mr. Dessie was appointed General Manager of the New York branch, although Mr. Messer retained the title of Chief Executive Officer. Exs. H, I; PTO § 6 ¶ 22. Mr. Dessie testified at trial that Mr. Messer retained this title as a convenience so that his benefits would not be disrupted close to his approaching retirement. Tr. 160-61. As of June 1988, however, although both Mr. Neukomm and Mr. Speeckaert reported to Mr. Dessie, they both were more highly compensated than he was. Tr. 189, 393-95; PTO § 6 ¶ 26. In June of 1989, Guy Dahin, the General Treasurer of Generale Bank, was appointed Chief Executive Officer of the New York branch, effective in November of that year. Tr. 861, 863-64; Ex. 35. In January 1990, one and a half years after his promotion to General Manager, Mr. Dessie was notified

that his position was being eliminated. Tr. 297–98; Ex. 58; PTO § 6 ¶ 62. His salary at that time was $220,000.[1] Tr. 193, 204; Exs. 37, 38; PTO § 6 ¶ 41.

In May 1990, Mr. Dessie commenced this action against Generale Bank in which he asserted that he was wrongfully terminated by Generale Bank and that he had been paid less from the period of May 1988 until his termination because of his race and/or national origin. PTO § 4 ¶ 1–2. In addition to compensatory damages, Mr. Dessie sought damages for mental anguish, humiliation and emotional distress caused by his termination. PTO § 4 ¶ 1(b). Trial of this case began on December 2, 1991. Tr. 1. On December 12, 1991 the court charged the jury according to a three-part "pretext" or McDonnell Douglas analysis which required Mr. Dessie to prove, *inter alia,* a prima facie case of discrimination in his compensation by establishing the following facts by a preponderance of the evidence: (1) that he was a member of the class protected by the statute; (2) that he was paid lower salaries and bonuses than the employees whose salaries were the subject of comparison; (3) that he did work equal to those employees; and (4) that such disparate treatment occurred in circumstances giving rise to an inference that Generale Bank discriminated against him on the basis of his race and/or national origin. Tr. 1282–85. The jury was then instructed that if it found that Mr. Dessie established a prima facie case, it should then consider whether Mr. Dessie had proved by a preponderance of the evidence that the reason given by Generale Bank for its compensation decisions—namely that the salaries and bonuses it paid to Mr. Dessie were consistent with his functions, seniority, experience, merit, and the relative market demand for individuals in his area of expertise—was merely a pretext for discrimination. *Id.*

During the charging conference after both sides had rested, Mr. Dessie argued for the first time that the jury should be charged that it should consider whether Generale Bank had discriminated against him by paying him less than Ian Messer, rather than just less than Mr. Neukomm and Mr. Speeckaert. Tr. 1120–22. Generale Bank objected on the ground that Mr. Dessie had never previously claimed that his salary should be compared to any officers other than Mr. Neukomm and Mr. Speeckaert, either in the Pleadings or in the Pre–Trial Order, nor had he offered any evidence at trial supporting such a comparison. Tr. 1120, 1122. The court ruled that Mr. Dessie's salary claim would be limited by the pleadings and the Pre–Trial Order and, thus, precluded any comparison to Mr. Messer's salary in connection with that claim. Tr. 1122.

On December 13, 1991, the jury returned a verdict in favor of Generale Bank on Mr. Dessie's termination claim, finding that Generale Bank had not discriminated against Mr. Dessie in connection with his discharge. Tr. 1321. The jury found in favor of Mr. Dessie on his salary claim, finding that between May 16, 1988 and January 15, 1990, Generale Bank had paid him $200,000 less than Mr. Neukomm and Mr. Speeckaert. Tr. 1322. The jury also found that Mr. Dessie had sustained $40,-000 in mental anguish damages. *Id.* Generale Bank then renewed a previously-made motion for judgment as a matter of law in accordance with Fed.R.Civ.P. 50(b). Tr. 1324–25.

## DISCUSSION

### I. *Judgment as a Matter of Law*

■ The legal standards applicable to a motion for judgment as a matter of law are well established.[2] Judgment as a matter of

---

1. A benefits booklet prepared for Mr. Dessie by Generale Bank in August 1989 indicated that his actual realized income for the year was in excess of $300,000. Tr. 203–04; Ex. 37.

2. Although the 1991 amendment of Rule 50 recast what was previously known as a motion for a directed verdict and a motion for a judgment

notwithstanding the verdict as a motion for judgment as a matter of law and a renewal of a motion for judgment as a matter of law, respectively, the Advisory Committee Notes to the amendment state that the amendment has no effect on the existing standards for such motions. Advisory Committee Notes at 141 sub (a).

law "should be granted only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [people] could not arrive at a verdict against it." *Bauer v. Raymark Industries, Inc.,* 849 F.2d 790, 792 (2d Cir.1988) (quoting *Malis v. Bankers Trust Co.,* 717 F.2d 683, 688–89 (2d Cir. 1983)); *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 168 (2d Cir.1980).

■ The court may consider all of the evidence favorable to the position of the party opposing the motion as well as any unfavorable evidence that the jury is required to believe. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2529 at 573. Thus, it may take into account evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses. *Id.; see also County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1314 (2d Cir.1990); *Simblest v. Maynard,* 427 F.2d 1, 5 (2d Cir.1970).

■ The trial court is "required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Smith v. Lightning Bolt Production, Inc.,* 861 F.2d 363, 367 (2d Cir.1988). Courts endeavoring to state a test for distinguishing between legitimate and unreasonable inferences have engaged in a multitude of formulations. *See, e.g., Fenner v. General Motors Corp.,* 657 F.2d 647, 651 (5th Cir.), *reh'g denied,* 657 F.2d 1251 (5th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982) ("An inference may be unreasonable if it is

'at war with uncontradicted or unimpeached facts.' "); *Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 744 (2d Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976), ("An inference will be upheld only if application of common experience and logic to the underlying evidence will support it."); *Selle v. Gibb,* 567 F.Supp. 1173, 1182 (N.D.Ill.1983), *aff'd,* 741 F.2d 896 (7th Cir.1984) ("Where the case of a plaintiff is based on an inference or inferences, it must fail upon proof of undisputed facts inconsistent with such inference or inferences."). The Second Circuit has opined that

> [i]n the fact finding process a trier is authorized to draw reasonable inferences from known or proven facts. But the inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and is not one of two or more inferences, both or all of which are about equally probable.

*National Labor Relations Board v. Gleason, Inc.,* 534 F.2d 466, 474 (2d Cir.1976) (action seeking enforcement of orders requiring employers to cease from certain conduct and making employees whole for any loss of income suffered as a result of such conduct).[3]

## II. *Salary Claim*

### A. Incidents That Allegedly Support An Inference of Discrimination

■ At trial, plaintiff presented evidence as to several incidents which took place during his tenure at Generale Bank, that he views as "[giving] meaning to the salary differential" between himself and Messrs. Neukomm and Speeckaert. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Judgment as a Matter of Law ("Pl.Mem. in Opp.") at 3. Mr. Dessie argued at trial, and in his opposition papers, that many of these incidents illus-

---

**3.** Although not all of these rulings were made in the context of appeals from judgments as a matter of law, they were based upon general principles of the law of inferences, which apply equally to a motion for summary judgment, to a motion for a directed verdict, to a Rule 104(a) evidentiary determination, or to any other situation in which a party seeks to meet his evidentiary burden by means of an inference. *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 513 F.Supp. 1100, 1171 (E.D.Penn.1981).

trate Generale Bank's attitude that he did not project the right "image" for the bank because of his race and/or national origin. *Id.*; Tr. 62, 234, 1256. It is from these events and from the bank's actions regarding his compensation and job security that Mr. Dessie argues that a jury could reasonably infer that he was discriminated against in the compensation he received. The court will discuss each event in turn.

#### 1. *Racist Statements*

Mr. Dessie presented evidence at trial that, at the time that Generale Bank's board of directors was considering his appointment as General Manager of the New York branch, Paul Janssen, a member of the board, had asked Ian Messer: "[W]hat [would] be the reaction of the banking community and what [would] be the reaction of our customers putting him [Dessie] as the number one person in New York?" Tr. 211. Mr. Messer replied that "in this day and age, as far as—his race should not matter but only performance." *Id.* Mr. Dessie received the appointment. Tr. 142; Ex. I.

At the time of this exchange, in addition to his position on the board, Mr. Janssen was in charge of both the accounting department and the London office of Generale Bank. Tr. 212. Towards the end of 1988, Mr. Janssen became the Chairman of the board. *Id.* Clearly Mr. Janssen held various positions of influence at the bank throughout Mr. Dessie's tenure; however, Mr. Dessie presented no evidence that Mr. Janssen had anything to do with the setting of his salary. On the contrary, the evidence was unequivocal that first Mr. Messer and then Andre Dirckx had that responsibility. Tr. 187–93, 392; Exs. 10, 32. Therefore, even assuming *arguendo* that Janssen was referring to Mr. Dessie's race and suggesting that it might create problems if Mr. Dessie were in charge of the New York branch, the court cannot conclude that it would then be reasonable for a jury to infer that this affected the setting of Mr. Dessie's salary.

Mr. Dessie also asserts that Mr. Dirckx made a racist comment, an assertion he

bases on the following excerpt from Ian Messer's deposition which was read at trial:

Q: Did Mr. Dirckx ever indicate to you that Mr. Dessie did not portray the right image for a Belgian bank in New York?

A: On one occasion he suggested to me that he was happier with my presence in the unit. I don't mean my physically being there, but the presence of—is that a good word?

Q: Did he indicate to you—

A: Image.

Q: Was that presence on account of your race?

A: No.

Q: Was the term that he used "image"?

A: No. Presence.

Q: Did any of the discussions with Mr. Dirckx give you the impression that Mr. Dirckx was concerned about Mr. Dessie's race?

A: No.

Tr. 561. The testimony continued with the following clarification:

Q: I would like to turn your attention then to your conversation with Mr. Dirckx with regard to his statement that he was happier with your presence in the New York branch. What did you take that to mean at the time?

A: Some people have a different presence and some personalities or presences are stronger than others. I assumed he was happier with mine.

Q: Did you take it then that he was referring to your business acumen or business capabilities?

A: Yes, absolutely, and my status in the marketplace.

Tr. 563–64.

Mr. Dessie's own witness, Ian Messer, states quite clearly that Mr. Dirckx was not referring to or concerned about Mr. Dessie's race. Mr. Dirckx, although not a disinterested witness, testified that he had not had Mr. Dessie's race and/or national origin in mind during the conversation. Tr. 665–69. Mr. Dessie himself testified that Mr. Messer had never discriminated against him. Tr. 396, 1109. While the

court recognizes that it is possible that Mr. Messer, at his deposition, wished to put a light on his conversation with Mr. Dirckx that was most favorable to himself and his abilities, the court concludes that a jury would be engaging in sheer speculation if it inferred that this conversation demonstrated racial and/or national origin bias on the part of Mr. Dirckx.

### 2. *Euromoney Conference*

Mr. Dessie argues that his not being allowed to represent Generale Bank at a Euromoney conference held in April 1989 is evidence of racial animus. Pl.Mem. in Opp. at 23; Tr. 419. According to Mr. Dessie, Generale Bank paid $60,000 to be a sponsor of the conference and had scheduled the Chairman of the bank's holding company and the Belgian ambassador from Washington, D.C. to participate on its behalf. Tr. 230–31. At some point prior to the conference, however, it became clear that the Chairman would be unable to attend. Tr. 231. Mr. Dessie then offered to substitute for the absentee Chairman, but was told by an "assistant of Mr. Janssen" that he should not do so. Tr. 232. Mr. Dessie later asked the head office if it would permit him to introduce the ambassador for the speech he was going to make, sit with him on the dais and introduce him to the other conference participants—a role that had been suggested to him by the Belgian Embassy. *Id.* He was again rebuffed. Mr. Dessie then offered to merely sit on the dais as a representative of the bank, to no avail. Tr. 232–33. Mr. Dessie never discussed the Euromoney conference incident with anybody at the bank. Tr. 234.

Although this sequence of events was probably very disappointing to Mr. Dessie, the court fails to see how a jury could reasonably infer that the bank's decision was a product of discrimination rather than any other number of possible explanations. The undisputed evidence showed that no one sat on the dais at the conference as an official representative of Generale Bank, despite its substantial expenditure as a sponsor. Tr. 690. Surely if Generale Bank had any intention of finding a substitute for the Chairman, but did not think that

Mr. Dessie could be that person because of his race and/or national origin, Generale Bank could have chosen one of its many other executives. The only fact the evidence shows is that Generale Bank decided that, because its chosen representative was unable to attend, it would not have a representative. If Generale Bank had sent a white executive then perhaps Mr. Dessie's interpretation might have some reasonable basis. But with that element missing, this incident cannot form the basis for Mr. Dessie's proposed inference.

### 3. *Marketing Brochure*

Mr. Dessie also claims that Generale Bank's failure to publish a marketing brochure which he produced and which contained his picture and biography can be construed as evidence of discrimination. Pl.Mem. in Opp. at 23; Tr. 419–20. Mr. Dessie testified that in the fall of 1988, he sent a proposed marketing brochure for the New York units to Francois Bette, the Head of Financial Centers in the Brussels office. Tr. 239–40. A memo attached to the brochure advised Bette that the "brochure [would] contain photographs of the Management Team and of the New York units' various departments." Ex. 16. In the ensuing weeks, Mr. Dessie sent various drafts of the brochure to the head office for approval. Tr. 243, 245; Exs. 17, 21. At some point, however, Mr. Dessie decided that a page of the brochure containing a "message from the General Manager" would be improved if it also included a portrait photograph of himself. Tr. 246; Ex. 22.

Mr. Dessie sent copies of this version of the brochure to Brussels. Tr. 249. The brochure was not distributed, however, even though approximately five hundred had been printed at a cost of $8,000. *Id.* When Mr. Dessie investigated the delay, he was advised by Patrick De Muynck, a Senior Vice President in the Marketing Department, that there was "a problem with [his] picture." *Id.*

After Guy Dahin was appointed Chief Executive Officer of the New York branch, yet another version of the brochure was produced, this time with a portrait photo-

graph of Mr. Dahin on the page preceding that with Mr. Dessie's photograph. Tr. 250; Ex. 23. Once again, Mr. Dessie attempted to have the brochure distributed, this time seeking Mr. Dahin's permission. Tr. 252. According to Mr. Dessie, Mr. Dahin "looked at [the brochure] rather concerned, looked at my picture, and he said that the Chairman doesn't like pictures like this," all the while pointing at the picture of Mr. Dessie and telling Mr. Dessie not to show the brochure to anybody. *Id.*

Mr. Dessie suggests that a jury could reasonably infer that the above sequence of events was based on a discriminatory desire to keep the fact that he was Black and not Belgian or Northern European from the banking community. Pl.Mem. in Opp. at 23. The court, however, disagrees. First, at the time of the initial negative reaction to the brochure, Mr. Dahin's appointment had already taken place or was imminent, and thus, Mr. Dessie would no longer be the highest-ranking individual at the New York branch. Tr. 250. This would most certainly "create a problem" with Mr. Dessie's picture. In addition, Mr. Dahin's statement is of such an ambiguous nature that without other probative evidence of discrimination, it is not very meaningful. Finally, as discussed above, even if this statement were viewed as evidence of Mr. Dahin's and/or the Chairman's racist attitudes, a jury still could not reasonably make the inferential leap to the conclusion that the decisions about Mr. Dessie's salary reached by Mr. Messer and Mr. Dirckx were discriminatory.

### 4. *Dirckx Memorandum*

Mr. Dessie also read to the jury part of a memorandum dating from November 1989 which Mr. Dahin had sent from his new position as Chief Executive Officer of the New York office to Andre Dirckx in the Brussels office in which he stated: "I have no problems with the rest of the branch—even with De Voghel, apart from the fact that I am still not convinced that it is necessary to have a Belgian (and at this level) in this job if the top man is from Brussels." Ex. 42. Mr. Dessie supplemented this with an excerpt from Mr. Dah-

in's deposition in which Mr. Dahin explained that he was referring to himself and, in the general sense, to the head office in Brussels rather than to a person's nationality per se. Tr. 589–90. Mr. Dahin came to the New York branch from the head office in Brussels. Ex. 35.

Once again, even if Mr. Dahin's letter is viewed by the court as evidence of an improper national origin consideration, the court concludes that a jury still could not reasonably make the inferential leap that this affected the decisions about Mr. Dessie's salary reached by Mr. Messer and Mr. Dirckx.

### 5. *Company Directory*

The last incident, which Mr. Dessie contends "gives meaning to the salary differential," concerns a company directory, which was published in his final months at the bank in order to familiarize bank employees with the identities and job functions of other bank employees throughout the various branches. Pl.Mem. in Opp. at 3; Tr. 825. Mr. Dessie's chief complaint is that the directory did not include a listing for him. Pl.Mem. in Opp. at 23; Tr. 420.

The evidence adduced at trial showed that in May of 1989, the General Manager of the Financial Markets Division, Andre Bergen, sent a letter to Mr. Dessie requesting his photograph and biography for what was to be an annual personnel directory. Tr. 825–27; Ex. 30. More specifically, the letter requested the biography of the "Number One in our Branches...." Ex. 30. The directory was published in late October/early November of that year as a loose leaf booklet with removable pages for easy annual updating. Tr. 530, 825. Each page of the directory carried a notation of "10/89," which indicated that the information with respect to the person on that page was current as of October 1989. Tr. 527.

Mr. Dessie argues that a jury could infer that the omission of his picture from the directory was a product of racial and/or national origin discrimination. However, it is clear that by the time that the directory was published Mr. Dessie was not the "Number One" in the New York branch. Mr. Dahin was appointed to the position of

Chief Executive Officer, a position superior to Mr. Dessie's, some four months before the directory was distributed. Ex. AK. Although the effective date of Mr. Dahin's appointment was in November, shortly after the directory's publication, the court cannot accept Mr. Dessie's contention that the omission of his picture and biography, from a directory which was to be used during the ensuing year, was evidence from which a jury could infer discrimination in his compensation.

### B. Compensation and Contract

In addition to the aforementioned incidents, Mr. Dessie argues that a jury could reasonably infer that he was the victim of discrimination by comparing Generale Bank's treatment of him in terms of his salary and job security with that of other executives at the bank.

#### 1. *Salary*

Mr. Dessie argues that, because he was the "number one man" in the New York branch of Generale Bank, he should have been paid more than or at least the same as Hans Neukomm and Patrick Speeckaert, two of the executives whom he supervised. Pl.Mem. in Opp. at 21; Ex. 29; *see also* Tr. 1256–57. Mr. Dessie asserts that a jury could reasonably infer an improper racist motive from the fact that he was paid less than these two men. Generale Bank's articulated non-discriminatory reason for paying Mr. Dessie at the level it did was that Mr. Dessie was paid commensurate with his experience, responsibilities, and the relative market demand for his position—all of which dictated that he be paid less than Messrs. Neukomm and Speeckaert.

The crux of Generale Bank's argument was that Mr. Dessie was not similarly situated to Neukomm and Speeckaert and that it was the dissimilarities, rather than Mr. Dessie's position in the chain of command, that determined his compensation. Mr. Dessie's response to this argument, without citation to any supporting evidence, is that "he was as qualified if not more qualified than those executives." Pl.Mem. in Opp. at 13. Defendant explained at trial that Mr. Neukomm's salary was higher

than Mr. Dessie's because he had twice as many years banking experience as Mr. Dessie and was a member of the treasury department—a department that always commanded a salary premium because of market demand. Tr. 402–04, 1034, 1038–39; Ex. 48. Evidence was also presented that Mr. Speeckaert was an expatriate officer, meaning that he had been temporarily relocated from the Brussels office, and, therefore, his salary contained certain allowances for his children's education abroad, the expense of maintaining two homes, and other inconveniences that made it difficult to meaningfully compare his salary to that of Mr. Dessie. Tr. 732, 1035–38; Ex. BI. In addition, there was uncontradicted testimony that Mr. Speeckaert's base salary, while he was in New York, was consistently only one quarter to one third of Mr. Dessie's salary. Tr. 1044–45; Ex. BI. Mr. Dessie did not present any evidence to cast doubt on defendant's proffered explanation.

In addition, it was uncontradicted at trial that throughout Mr. Dessie's tenure at Generale Bank, only two individuals were responsible for setting his salary: Ian Messer and Andre Dirckx. Tr. 187–93, 392; Exs. 10, 32. Mr. Messer was responsible for setting both Mr. Dessie's and Mr. Neukomm's salaries from 1984 until Mr. Messer left the New York branch in 1988. Tr. 392. Mr. Speeckaert's salary was set by the main office in Brussels. *Id.* Mr. Dessie himself testified that Mr. Messer was a friend and colleague, who had never discriminated against him, and with whom he subsequently went into business. Tr. 396, 1109. Yet, when Mr. Dessie and Mr. Neukomm were hired by Generale Bank in the Spring of 1984, Mr. Messer set their salaries at $85,000 and approximately $140,000, respectively. Tr. 114, 573, 1043; PTO § 6 ¶ 7. Not only did Mr. Dessie acknowledge that his salary had been less than Mr. Neukomm's since 1984, but this differential had been maintained annually on at least five separate occasions by Mr. Messer. Tr. 395–6; PTO § 6 ¶ 9–11, 13, 19. It was also undisputed that the pay increases that Mr. Dessie received throughout his tenure at Generale Bank were equal to or greater

than those received by other employees of the bank. Tr. 401–02.

Once Mr. Messer left for London, Mr. Dirckx assumed responsibility for setting Mr. Dessie's salary. Exs. 29, 32. Mr. Dessie points to the fact that Mr. Dirckx did not directly respond to a request he made for a retroactive salary review as evidence of discrimination. Pl.Mem. in Opp. 22–23. The court has already explained why it does not agree with Mr. Dessie's claim that he offered sufficient evidence at trial to support a reasonable inference by the jury that Mr. Dirckx possessed racist attitudes, and Mr. Dirckx's actions taken alone certainly do not support an inference of discrimination.

In April 1989, Mr. Dessie wrote Mr. Dirckx, requesting a salary adjustment to reflect his promotion approximately one year earlier to General Manager, retroactive to the date of his appointment, as well as an annual salary increase, effective upon the one year anniversary date of his promotion. Ex. 29. Mr. Dirckx responded by according Mr. Dessie a 10% annual increase in salary—a percentage increase that was in keeping with that provided to other individuals at the bank at that point in time—effective on the anniversary of his promotion. Ex. 32. Mr. Dessie's request for a retroactive adjustment went unanswered. *Id.* It is unclear to the court why Mr. Dessie thinks that a jury could reasonably infer that Mr. Dirckx's mere silence on this subject was an act of discrimination. This inference also contradicts the undisputed fact that several days before his promotion was announced, but after the board of directors had voted, Mr. Dessie was accorded a 25% raise. Exs. 10, 12. Surely the more reasonable explanation for Mr. Dirckx's failure to respond to Mr. Dessie's request is that he believed that Mr. Dessie had already received such a raise.[4]

### 2. *Lack of Job Security*

Plaintiff also cites defendant's not providing him with "job security" in the form of a contract as evidence of discrimination. Pl.Mem. in Opp. at 23. It was undisputed at trial that several officers of the New York branch, including Mr. Dessie, were promised some form of job security in the spring of 1989. Ex. 28. Mr. Dessie, however, also testified that none of these officers received a contract or any other tangible form of job security while he was employed by Generale Bank, and he never presented any evidence that anyone, superior or subordinate to him, received a contract after his departure. Tr. 438–39. In fact, according to Mr. Dessie, the only person in the New York branch that ever had a contract was Ian Messer. Tr. 438. Mr. Messer launched both the New York and London branch offices of Generale Bank and had substantially more banking experience than Mr. Dessie. Tr. 671–72. Mr. Dessie never presented any evidence to cast doubt on Generale Bank's contention that Mr. Messer's contract was unique at the New York branch and provided under exceptional circumstances. Tr. 670–73.

### C. Sum of the Parts

The court is aware that a plaintiff in a discrimination case has a heavy burden of proof and is frequently forced to rely almost entirely on circumstantial evidence to prove his case. The court is also aware that even though an isolated event may not lead to a reasonable inference of discrimination, it is possible that a juxtaposition of many events might cause a scenario to come into focus from which discrimination could reasonably be inferred. That, however, is not the case here. After examining all of the evidence in the light most favorable to the plaintiff, the court concludes that the whole is not greater than the sum of its parts and that there is such a complete absence of evidence supporting the verdict that the jury's findings could have only been the result of surmise and conjecture. Accordingly, the court grants defen-

---

**4.** Even if the jury and the court accepted Mr. Dessie's contention that he did not receive a raise upon his promotion, the court cannot accept his further contention that such an act was against Generale's own policy and, therefore, evidence of discrimination. Mr. Dessie himself testified that Mr. Neukomm did not get a raise upon his promotion to General Manager. Tr. 414–15.

dant's motion for judgment as a matter of law on plaintiff's salary claim.

### III. *Mental Anguish Damages*

Because plaintiff failed to prove that he suffered discrimination on either his termination or disparate compensation claims, an award of damages for mental distress caused by such discrimination must also be set aside. Furthermore, even had the court found sufficient evidence in the record for plaintiff to defeat defendant's motion, there is insufficient evidence in the record to support the jury's award of mental anguish damages. To begin with, Mr. Dessie's claim for mental anguish was limited, both in his pleadings and in the evidence he offered at trial, to his termination claim. Because the jury found that Generale Bank did not discriminate against Mr. Dessie in connection with his termination, it could not have found for him on his claim for mental anguish damages. In addition, even though the jury decided in Mr. Dessie's favor on his salary claim, Mr. Dessie offered no evidence of any mental anguish he suffered in conjunction with that claim. Therefore, even if defendants had not prevailed on their motion to set aside the jury's award of back pay, Mr. Dessie's award for mental distress could not be allowed to stand.

Mr. Dessie argues that even though his testimony about the mental distress he suffered was made in the context of his termination claim, a fair reading of the testimony also supports the inference that the mental anguish he suffered related to the disparate treatment he received in terms of salary and other benefits. Pl.Mem. in Opp. at 27. The court has reviewed the testimony, however, and cannot agree with plaintiff's interpretation of the evidence.

▇▇ Plaintiff also directs the court to various parts of the transcript which he claims amply support an award of mental distress damages for his salary claim and

which could explain the jury's award. Pl. Mem. in Opp. at 28. However, the court disagrees with plaintiff's characterization of the evidence and concludes that a jury award of mental distress damages based on these superficial and truncated references to plaintiff's emotional state would have to be based on sheer speculation and conjecture.[5]

Finally, even were the court to apply all of plaintiff's mental anguish testimony relating to his termination to his salary claim, such scant testimony by a plaintiff cannot support a claim for mental anguish damages under New York law. *See Cosmos Forms, Ltd. v. State Div. of Human Rights*, 150 A.D.2d 442, 442, 541 N.Y.S.2d 50, 51 (App.Div.1989) (award of $35,000 for mental anguish was grossly excessive where only evidence of mental anguish was complainant's own testimony that she was "[e]motionally and physically screwed up," without any evidence of duration of her condition, its severity, or consequences and without evidence of any treatment); *Trans World Airlines, Inc. v. New York Executive Dep't, State Div. of Human Rights*, 147 A.D.2d 575, 576, 537 N.Y.S.2d 868, 870 (App.Div.1989) (testimony of complainant that he was "depressed" did not constitute substantial evidence that he suffered mental anguish). Accordingly, the court concludes that defendant should be granted judgment as a matter of law on Mr. Dessie's claim for damages for mental anguish.

### CONCLUSION

For the reasons stated above, it is hereby ordered that defendant Generale Bank be granted judgment as a matter of law on plaintiff Alazar Dessie's claim for relief for discriminatory treatment in the determination of his salary, for which the jury awarded $200,000, and on plaintiff Alazar Dessie's claim for damages for mental anguish, for which the jury awarded $40,000. It is

---

5. Plaintiff testified that he was "upset" that others were paid more than he was and that he was dissatisfied with his salary. Tr. 392–93. Plaintiff also testified that he was "very disappointed" that he could not attend the Euromoney conference. Tr. 233. Finally, plaintiff mentioned that

he had been having problems with his heartbeat in the months prior to his termination, but presented no evidence as to what the condition was, what caused it, or its duration. Tr. 359, 458.

further ordered that the judgment entered December 31, 1991 is set aside and that the clerk will enter judgment in favor of the defendant Generale Bank.

So ordered.